No. 66,225

STATE OF KANSAS, *Appellee*, v. JAMES WALKER, *Appellant.*

(845 P.2d 1)

280

Opinion filed January 22, 1993.

*Thomas Jacquinot*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Debra S. Byrd*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: James Walker appeals his jury trial convictions of first-degree premeditated murder (K.S.A. 1991 Supp. 21-3401); aggravated robbery (K.S.A. 21-3427); aggravated assault (K.S.A. 21-3410); attempted aggravated criminal sodomy (K.S.A. 1991 Supp. 21-3301; K.S.A. 21-3506); aggravated criminal sodomy (K.S.A. 21-3506[c]); battery (K.S.A. 21-3412); aggravated battery (K.S.A. 21-3414); two counts of theft (K.S.A. 21-3701[a]); two counts of rape (K.S.A. 21-3502); three counts of aggravated burglary (K.S.A. 21-3716); and four counts of aggravated kidnapping (K.S.A. 21-3421). Appeal is also taken from the imposition of the "hard 40" sentence on the first-degree murder conviction pursuant to K.S.A. 1991 Supp. 21-4624 *et seq.*

The convictions arise from four incidents occurring in Sedgwick County. They may be characterized as occurring in or commencing in the: (1) Darin Adams residence on North Vassar Street (June 25, 1990); (2) Kenneth Lowe residence on Old Manor Street (July 20, 1990); (3) Jerome Alcorn residence on Indianapolis Street

(July 21, 1990); and (4) Sylvester Johnson residence on East Zimmerly Street (July 21, 1990). Inasmuch as the facts relative to the numerous offenses are lengthy and have little or no bearing on most of the issues raised, our recitation of facts will be limited to those needed for resolution of particular issues. Three companion cases to the appeal before us are *State v. Bailey*, 251 Kan. 156, 834 P.2d 342 (1992); *State v. Hooks*, 251 Kan. 755, 840 P.2d 483 (1992); and *State v. Walker*, 252 Kan. 117, 834 P.2d 203 (1992). The facts relative to each of the various offenses are set forth in one or more of said cases.

## JURY SELECTION PROCESS

For his first issue, defendant contends Sedgwick County's system of selecting prospective jurors from voter registration lists violated his right to a fair and impartial jury selected from a fair cross section of the community, a right guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. Similar challenges were made in two of the companion cases, *State v. Bailey*, 251 Kan. 156, and *State v. Walker*, 252 Kan. 117, wherein we held: "The use of voter registration lists as the sole source for the selection of jury panels is examined and held not to have been shown to be statutorily or constitutionally impermissible."

No additional showing has been made herein to remove this case from the application of the rule stated in *Bailey* and *Walker*.

## CONFESSION

For his second issue, defendant contends the district court erred in refusing to suppress his confession.

A *Jackson v. Denno* hearing was held herein. In *State v. Price*, 247 Kan. 100, Syl. ¶ 1, 795 P.2d 57 (1990), we held:

"The purpose of a *Jackson v. Denno* hearing is to allow the trial court to determine the voluntariness of a statement or confession. Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. Following *State v. Prince*, 227 Kan. 137, Syl. ¶ 4, 605 P.2d 563 (1980)."

In *State v. William*, 248 Kan. 389, Syl. ¶ 11, 807 P.2d 1292, *cert. denied* 116 L. Ed. 2d 89 (1991), we stated: "In determining whether a confession is voluntary, a court is to look at the totality of the circumstances."

In *State v. Norris*, 244 Kan. 326, 333, 768 P.2d 296 (1989), we set forth the standard of review for a trial court's determination that a confession was voluntary:

" 'When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily and knowingly given and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence. [Citations omitted.]' " (quoting *State v. Brown*, 235 Kan. 688, 691, 681 P.2d 1071 [1984]).

See *State v. William*, 248 Kan. 389, Syl. ¶ 13.

Defendant contends his confession was coerced and involuntary. He argues: (1) the police intentionally deprived him of sleep; (2) the police used physical force against him; (3) he is of limited intellect; and (4) he was intoxicated.

Defendant was observed driving Rose Ann Johnson's automobile, who was known to have been kidnapped (one of the charges ultimately brought herein), and who was missing. Defendant was apprehended and contends he was physically abused by an officer in the process. He arrived at the police station at approximately 3:22 a.m. The transporting officer testified he had no trouble understanding the defendant although he appeared moderately intoxicated. While en route to the station, defendant asked if he could sleep. Permission was granted.

Upon his arrival at the station, defendant gave a lucid personal history. At 4:46 a.m., defendant was given his *Miranda* rights. The officer reading the rights to him testified defendant appeared to be mildly intoxicated or to have just awakened. The officer testified he had no difficulty communicating with the defendant. No interview was attempted at this time as it was decided this should be left to a homicide detective.

The interview commenced at 11:30 a.m. Defendant, who had been previously handcuffed to a table, was freed and was again read his *Miranda* rights. The detective did not interview him earlier as he had been interviewing codefendants in the crimes herein. The detective did not observe any sign of intoxication in

the defendant and testified defendant was responsive. Defendant denied any involvement in the murder of Rose Ann Johnson, and the detective prepared to leave. Defendant called the detective back and stated that he and his associates had killed Rose Ann Johnson and put her under a tree. He was again given his *Miranda* rights, and his confession was tape-recorded. In his confession, defendant was coherent and gave addresses and details of the events involved leading up to the killing of Ms. Johnson.

The circumstances relative to the time period defendant was held at the police station, the conditions under which he was held there, and the delay in commencing the interview are comparable to those set forth in *State v. Hooks*, 251 Kan. 755, wherein we held the trial court's admission of the confession was not improper.

We find no merit in defendant's claim that his motion to suppress his confession was improperly denied.

## EVIDENCE OF GANG MEMBERSHIP

For his third issue, defendant contends the trial court improperly admitted evidence of defendant's membership in a street gang.

This issue was also raised in *State v. Hooks*, 251 Kan. 755, and *State v. Walker*, 252 Kan. 117. As in these other cases arising out of the incidents herein, there was testimony from victims about conversations and observations made during the commission of the crimes relative to the perpetrators' memberships in the Insane Crips gang. As in these companion cases, defendant argues herein the purpose of the admission of such testimony was to inflame the jury.

As we held in the companion cases, such evidence was part of the res gestae of the offenses and was relevant to the aiding and abetting aspects of the case. We find no abuse of discretion in the admission of such evidence.

## RAPE SHIELD STATUTE

Defendant sought the introduction of evidence that he had had a prior sexual relationship with D.G., the victim in the attempted aggravated criminal sodomy conviction and one of the rape convictions. Defendant contends evidence that he had prior sexual relations with D.G. was relevant to his defense that D.G. con-

sented to any sexual acts between herself and the defendant, and it "tended to discredit D.G.'s and Alcorn's claims that they were terrorized and held hostage in their own apartment."

K.S.A. 21-3525(2) provides the general rule concerning the admissibility of evidence of prior sexual contact of a sexually abused victim as follows:

"(2) Except as provided in subsection (3), in any prosecution to which this section applies, *evidence of the complaining witness' previous sexual conduct with any person including the defendant shall not be admissible, and no reference shall be made thereto in the presence of the jury,* except under the following conditions: The defendant shall make a written motion to the court to admit evidence or testimony concerning the previous sexual conduct of the complaining witness. The motion must be made at least seven days before the commencement of the trial unless that requirement is waived by the court. The motion shall state the nature of such evidence or testimony and its relevancy and shall be accompanied by an affidavit in which an offer of proof of the previous sexual conduct of the complaining witness is stated. The court shall conduct a hearing on the motion in camera. At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the previous sexual conduct of the complaining witness is relevant and is not otherwise inadmissible as evidence, the court may make an order stating what evidence may be introduced by the defendant and the nature of the questions to be permitted. The defendant may then offer evidence and question witnesses in accordance with the order of the court." (Emphasis supplied.)

In *State v. Stellwagen*, 232 Kan. 744, 747, 659 P.2d 167 (1983), we said (of a predecessor statute [K.S.A. 60-447a (Weeks)] to K.S.A. 21-3525):

"In the rape shield act the legislature sent a clear message to the courts that a rape victim's prior sexual activity is generally inadmissible since prior sexual activity, even with the accused, does not of itself imply consent to the act complained of. In saying this the legislature was attempting to further the strong state interest in protecting the rape victim."

The appellate standard of review of a trial court's rulings on motions to exclude evidence is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it

cannot be said that the trial court abused its discretion. *State v. Martin*, 237 Kan. 285, Syl. ¶ 2, 699 P.2d 486 (1985).

There was no claim of consensual sexual relations between D.G. and defendant on the night in question. The testimony was that defendant beat and choked D.G., demanding that she perform oral sodomy on two of his associates who were present. They also struck D.G. Defendant then attempted to sodomize D.G. and choked her into submission to the rape. Whether or not defendant and D.G. did or did not consensually engage in sexual relations on some prior occasion has no relevance to the events of the night in question and was properly excluded under the rape shield statute.

We find no abuse of discretion in the trial court's refusal to admit evidence of the alleged prior sexual relationship between D.G. and defendant.

## PHOTOGRAPHIC EXHIBITS

Defendant contends the photographs and transparencies depicting murder victim Rose Ann Johnson had no probative value, were cumulative and gruesome, and served only to inflame the jury.

In *State v. Hobson*, 234 Kan. 133, 152-53, 671 P.2d 1365 (1983), we said:

"The rules pertaining to the admission of photographs in a criminal prosecution are well established and often repeated by this court. Recently in *State v. Garcia*, 233 Kan. 589, 592-93, 664 P.2d 1343 (1983), we summarized the rules as follows:

" 'In a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. See, *e.g.*, *State v. Green*, 232 Kan. 116, 118, 652 P.2d 697 (1982), and cases cited therein. Even where the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged; and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. *State v. Campbell*, 210 Kan. 265, 276, 500 P.2d 21 (1972); *State v. Dargatz*, 228 Kan. 322, 329, 614 P.2d 430 (1980); *State v. Henson*, 221 Kan. 635, 647, 562 P.2d 51 (1977). Photographs depicting the extent, nature and number of wounds inflicted are generally relevant in a first-degree murder case. *State v. McCorgary*, 224 Kan. 677, 681, 585 P.2d 1024 (1978). Photographs are erroneously admitted when they

are unduly repetitious, gruesome, and add nothing to the State's case. *State v. Dargatz*, 228 Kan. at 329; *State v. Henson*, 221 Kan. at 647; *State v. Clark*, 218 Kan. 18, 24, 542 P.2d 291 (1975).' "

The admission of photographs as evidence in a homicide case rests within the trial court's discretion, and that court's ruling will not be disturbed on appeal absent a showing of abuse of discretion. Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. Demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. *State v. Mayberry*, 248 Kan. 369, Syl. ¶ 12, 807 P.2d 86 (1991).

Eleven transparencies and eight photographs depicting the victim and the area where her body was found were admitted. One transparency and one photograph showed the hyoid bone which had been removed during the autopsy. One transparency showed the victim alive and well. All other photographic material depicting the deceased showed various injuries received by her during the brutal and sustained attack upon her. No invasive autopsy procedures are depicted. The photographs showed what the victim's killers did to her. The victim was stomped to death with resultant massive injuries, especially to the head and neck areas. The studio photograph taken in life shows how the victim appeared before the attack rendered her virtually unrecognizable.

We find no abuse of discretion in the admission of the photographic material herein.

Also included within this issue is a complaint relative to the size of the image projected from the transparencies. By virtue of their being transparencies, they were projected "larger than life." Defendant contends this was improper. No authority is cited in support of this proposition. All jurors could presumably see the image depicted simultaneously and follow the pathologist's testimony in regard to the injuries inflicted. We find no merit in this point.

Finally, defendant argues the prosecutor projected the transparency of the victim in life for too long a period—thus inflaming the jurors' passions and prejudicing them toward defendant. Defendant states in his brief that this transparency was displayed

for 10 to 15 minutes during trial and, additionally, during the State's closing argument. No authority is cited for the proposition that some sort of time restriction formula exists for the display of photographic exhibits. Although, presumably, display of such material at times during the trial when the display has no bearing on what is being presented could reach an impermissible level, we find no error or abuse of discretion on this point under the circumstances alleged herein.

## PROSECUTORIAL MISCONDUCT

For his next issue, defendant complains that prosecutorial misconduct deprived him of a fair trial. Three areas of specific complaint are made. The first is alleged provocative conduct during the prosecution's opening statement. As the prosecutor was relating that the evidence would show the victim was pleading for her life while she was being kicked and beaten, he struck his counsel table two or three times for emphasis. It is difficult to consider this as a claim of misconduct as opposed to a matter of style of presentation. We find no merit in this claim. Defense counsel also objected and counsel for the appellate defender's office continues to object to the prosecutor, on one occasion during the opening statement, "shaking his finger about a foot and a half from my client's face." Defendant contends this was part of a strategy to anger the defendant and make him react unfavorably in the jury's presence. Although the alleged finger pointing at close range appears to be rather excessive, we can hardly conclude that this single event deprived defendant of a fair trial.

For his second point, defendant complains about a statement made by the prosecutor during closing arguments. That remark is as follows:

"At some point you are going to be relieved from the admonition the Court gave and go back to your family and friends in the neighborhood and talk about what happened, what happened that week or two when you were down at the courthouse. You can tell them. What did the evidence show? The evidence showed that he kidnapped this woman, raped her."

Defendant characterizes this as a warning to jurors that they would be held accountable to their friends and family if they acquitted the defendant. We do not agree with this interpretation.

Although not stated too artfully, the prosecutor is apparently saying to the jurors that although they had been told by the court not to discuss the case, that admonition was not permanent and, if the jurors then talked about their jury service, they could say the evidence showed the victim was kidnapped and raped by the defendant. The statement on its face is rather innocuous, and there is no foothold for reversible error therein.

For his third and final point on this issue, defendant contends the prosecutor's display of victim Rose Ann Johnson's studio portrait transparency during his closing argument constituted prosecutorial misconduct. Apparently, defense counsel turned the projector off at least once and the prosecutor turned it back on. The prosecutor then stated:

"You might have noticed there has been a battle of the overhead, when the State may turn it on and Mr. Ney turns it off. True, in a criminal proceeding the focus is always on the Defendant, whether his rights are protected, whether or not the evidence proves guilt beyond a reasonable doubt. We don't want to lose focus of why we are here, also. This is the woman this man robbed of the merriment of life and we don't want you to forget that."

The display of the photograph has been held not to be improper in the preceding issue. As for the comment about the turning of the projector off and on, we find no reversible error therein.

We find no merit to the claim of prosecutorial misconduct herein.

## JUDICIAL MISCONDUCT

Defendant contends that judicial misconduct during the trial warrants reversal of the convictions and the granting of a new trial.

Defendant contends that he was denied due process of law because of judicial misconduct as follows: (1) manner of conduct and facial expressions; (2) treatment of defense counsel in front of the jury; and (3) disciplining defense counsel off the record.

The trial judge is not merely a moderator, but is the governor of the trial. The judge must strive to have the trial conducted in an atmosphere of impartiality and should refrain from remarks or conduct that may injure a litigant. *State v. Hamilton*, 240 Kan. 539, Syl. ¶ 3, 731 P.2d 863 (1987).

The trial judge should be the exemplar of dignity and impartiality. He should exercise restraint over his conduct and utterances. He should suppress his personal predilections, and control his temper and emotions. He should not permit any person in the courtroom to embroil him in conflict, and he should otherwise avoid conduct on his part which tends to demean the proceedings or to undermine his authority in the courtroom. When it becomes necessary during the trial for him to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, he should do so in a firm, dignified, and restrained manner, avoiding repartee, limiting his comments and rulings to what is reasonably required for the orderly progress of the trial, and refraining from unnecessary disparagement of persons or issues. *State v. Hamilton*, 240 Kan. 539, Syl. ¶ 4.

The trial court has broad discretion in controlling the proceedings at trial. Allegations of judicial misconduct must be decided on the particular facts and circumstances of each case. Reversal is required only when the appellant has shown the conduct prejudiced his substantial rights. *State v. Chism*, 243 Kan. 484, Syl. ¶ 9, 759 P.2d 105 (1988).

In *State v. Grissom*, 251 Kan. 851, Syl. ¶ 36, 840 P.2d 1142 (1992), we amplified the above rules as follows:

"Allegations of judicial misconduct must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it affirmatively must appear the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. A mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial."

Specific allegations of misconduct are made as follows. During defense counsel's cross-examination of victim Jerome Alcorn, the following exchange occurred between defense counsel and the court:

"Q. Is that yes or no that you are in shock today?

"THE COURT: No, he has answered you very completely.

"MR. NEY [defendant's counsel]: I would object to the Court's characterization, once again.

"THE COURT: Mr. Ney, I rule that he has answered completely. That is my ruling.

"MR. NEY: I note for the record the Court's stern nature, pointing at me and looking at me in a stern manner in front of the jury.

"THE COURT: If a lawyer in this court makes an objection, it's in the record. That is all that is required. The colloquy is out of place and I will ask you not to repeat the colloquy again. Let's proceed with the trial."

Defendant contends that the judicial finger-pointing referred to constitutes misconduct.

Defendant also objects to the trial judge removing his glasses when addressing defense counsel during the following colloquy:

"MR. NEY: I would object to the Court's question about anything in the witness' mind.

"THE COURT: Counselor, let's get it straight. There was an objection about hearsay. What is going through someone's mind is not hearsay. It's a fact. Therefore, I have ruled. I have instructed the witness and the witness may answer.

"MR. NEY: I have a right to object to that the first time that question had been proposed, when the Court proposed or counsel proposed it, I have a right to make my objection for the record. I note for the record the Court is taking his glasses off.

"THE COURT: Stop the argument.

"MR. NEY: The Court is yelling to me and ordering me to sit down in a loud voice in front of the jury.

"THE COURT: Mr. Ney, we are not going to have this trial changed into some kind of a continuing argument. I will tell you once more, the rules are the rules of the Court. State your objection. If I need argument, I will ask counsel for argument. If I do not ask for argument, it's not necessary, nor allowed to make an argument, because the law is that the objection is preserved in the record."

Defendant objects to the trial judge's bench "pounding" in the following colloquy:

"Q. [By defendant's counsel:] So Mr. Alcorn appears apparently the same after a terrorizing incident as he does months later; would that be right?

"A. His behavior today was approximately the same as it was the morning I talked to him.

"MR. NEY: All right, thank you.

"MR. WHITE [State's attorney]: I have no re-re-recross.

"THE COURT: The last few exchanges are purely argument by counsel. You may step down. Thank you.

"MR. NEY: I would note my objection of that characterization.

"THE COURT: It's not a characterization. It's a statement.

"MR. NEY: I would note the Court pounded the bench with a pen when he made that observation.

"THE COURT: We will reconvene at five minutes after four. The jury will be excused to the jury room for a recess."

Defendant also objects to certain rulings made by the trial court in applying the rape shield statute and to other evidentiary rulings. These rulings were against defense counsel's position, but we find nothing therein supporting a claim of judicial misconduct.

It is clear from the record that defense counsel was vigorously and, at times, abrasively representing his client in the trial herein. The following comments of the prosecutor, made in an in-chambers hearing, are significant:

"I note on the record, and I would at this point in time like to place on the record I have been present during the entire course of the trial. I have noted the conduct of Mr. Ney which at some time in my opinion approached reprehensible conduct. He uses a very loud voice. I have been sitting next to him at counsel table, almost breaks my eardrums, addresses the Court in a very loud manner, makes objections, the Court rules, he continues to argue. The Court cuts off his argument and he continues to argue in front of the jury with the Judge, giving no respect to the bench."

The purpose of this in-chambers proceeding was to allow defense counsel to put on the record a complaint about an off-the-record proceeding wherein the trial court had, apparently, chastised defense counsel for his trial conduct. The following occurred:

"MR. NEY: Our problem is we don't have a record of that hearing. The fact the Judge refused a record is an indication of what went on. I know every time I tried to make an objection or state my legal grounds to the Court, I have been interrupted by the Court and at numerous times in court the Judge has made disparaging looks to the jury, looked at the ceiling, pounded the table, and I have put on the record when yelled at.

"THE COURT: You missed that one. The table hadn't been pounded.

"MR. NEY: Pounded the bench.

"Judge Sanborn is now here and wants to give his version.

"THE COURT: I don't have to give my version. I have been taught, if you believe the lawyer is out of line, you call them back and discuss it. That's the standard of conduct in this state. It's not supposed to be on the record. The only reason we are doing this is because you wanted to make statements. It isn't any right you have. It's just a matter that's being afforded to you.

"You frequently say, during the trial, when I have already ruled, 'I want to make a record on that.' You should know it's surplusage. You made an objection, the objection was dealt with, the ruling is in the court reporter's notes. There is no requirement that you otherwise save it or note an exception. The law of Kansas is very clear. You do have to state your grounds, because the rule is if there is a general objection and it's overruled without a specific objection being called to the Court's attention, you then might

lose that as a ground for impeachment, but I don't intend to be tried in this case. I don't intend to have my authority disparaged in front of the jury and I intend to have this trial go forward with the lawyers acting in a lawyer-like fashion and that is what is going to have to occur and that is what will occur.

"This business of always have to have the last word, unfortunately, just prolongs the record.

"MR. NEY: I did not get any words in the record when I needed them in the record. It's my statement, what you call the proper procedure, taking counsel back and woodshedding them without a record and berating counsel without a record present—

"THE COURT: (Interrupting) You are supposed to have it in private. That's lawyer-like. I don't know if you understand what that means.

"MR. NEY: For the record, the Court is yelling and glaring at me and pointing a finger.

"THE COURT: Will you be quiet and show courtesy?

"MR. NEY: When I see some, I will show some.

"THE COURT: You do not seem to understand it's a standard of conduct in this state that [if] the Judge feels things are getting out of hand, he is supposed to take the lawyers back in his chambers without a record. That's what he is supposed to do and that's what I did.

"MR. NEY: He is supposed to yell at them and threaten them with contempt? Which is what he did.

"THE COURT: If the lawyer, instead of understanding what the Court's expectations of the lawyer are, instead attacks the issues, then the Court has to be firm and put them on notice.

"MR. NEY: I didn't attack the issue. There is no record on the issue of that hearing."

If a trial court concludes that one or more trial counsel is or are behaving improperly in the courtroom, any discussion of the matter should certainly be taken up out of the presence of the jury. However, it does not follow that an off-the-record proceeding is an appropriate method for resolution of the problem. This case well illustrates the point. This is a criminal case involving multiple major felonies. A conviction would almost certainly result in an appeal. The very conduct of counsel which was the reason for the trial judge having held the off-the-record proceeding was the result of perceived courtroom clashes between court and counsel and would, in all likelihood, be an issue in any appeal by the defendant. Yet there is no record. Had the attorney been subsequently held in contempt, no record would have existed as to exactly what had been said in the hearing and what warning issued.

While we disapprove of the holding of the complained-of proceeding off the record, we find no basis for defendant's assertion that judicial misconduct deprived him of a fair trial.

## INSTRUCTIONS

For his next issue, defendant makes three separate complaints relative to the instructions herein. For his first point, defendant objects to an addition made to each of the elements instructions. The emphasized portion of the first paragraph of the elements instruction for the aggravated kidnapping of Rose Ann Johnson illustrates the complained-of addition:

"Defendant is charged with the crime of Aggravated Kidnapping. Defendant pleads not guilty. To establish this charge, each of the following claims must be proved. Defendant, *or someone acting in concert with him,* unlawfully, willfully, did
1. take or confine Rose Ann Johnson,
2. by force,
3. with intent to hold Rose Ann Johnson,
4. to facilitate the commission of the crime of Aggravated Robbery and Rape,
5. and did inflict bodily harm upon Rose Ann Johnson,
6. this happened in Sedgwick County, Kansas, and on or about July 21, 1990.
Rape is bodily harm." (Emphasis supplied.)

The following separate aiding and abetting instruction was given:

"Liability for crimes of another: (1) a person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime; (2) a person liable under subsection (1) hereof is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing, or attempting to commit, the crime intended; (3) a person liable under this section may be charged with, and convicted of, the crime although the person alleged to have directly committed the act constituting the crime lacked criminal capacity or has not been convicted, or has been acquitted, or has been convicted of some other degree of the crime, or of some other crime based on the same act.

"Mere presence at the scene where a crime is committed, does not, in and of itself, make a person guilty of having committed the crime."

Defendant objects on the basis that the phrase "someone acting in concert with him" contained in each of the elements instructions does not correlate to the aiding and abetting instruction,

as such language is not continued therein. This was picked up by the jury as, during deliberations, the jury requested a definition of "acting in concert." To the request, the court responded as follows:

" 'Acting in Concert.'-Action in which 2 or more persons participate, combined action, accord, together, joint, to contrive or arrange by agreement, to plan or act together.

"And see 'Liability for Crimes of Another' instruction."

Jury instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. *State v. Jones*, 233 Kan. 112, 115, 660 P.2d 948 (1983).

Applying this rule to the matter before us, we find no reversible error. The response tied the instructions together, did not lessen the State's burden of proof, and adequately stated the applicable law.

For his second point in this issue, defendant contends the trial court's instruction on voluntary intoxication was improperly stated and this error removed voluntary intoxication from meaningful jury consideration.

PIK Crim. 2d 54.11 (1988 Supp.) provides:

"Intoxication involuntarily produced is a defense if it renders the accused substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct to the requirements of law."

PIK Crim. 2d 54.12 (1988 Supp.) provides:

"Voluntary intoxication is not a defense to a charge of (set out general intent crime).

"Voluntary intoxication however, may be a defense where the evidence indicates that a defendant acted only as an aider or abettor, and may be considered in determining whether such defendant was capable of forming the required intent to aid or abet the commission of (general intent crime charged)."

Neither instruction was given. Rather, a total of four instructions were given on the subject. They are as follows:

## No. 31

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining whether or not such intent or state of mind existed."

## No. 32

"Defendant has claimed as a defense voluntary intoxication. Voluntary intoxication is not a defense to crime; however, in the case of certain crimes called specific intent crimes, if the jury believes from all the facts and circumstances that defendant was intoxicated, and that the intoxication was to such a degree that defendant's mental faculties were impaired, and that such impairment was to such an extent that the defendant was incapable of forming the specific intent which is an element of the crime, that is, if the defendant *'was utterly devoid of consciousness or awareness'* of what he was doing then the jury may take that fact into consideration in determining whether or not such intent or state of mind existed. Likewise, in considering whether defendant bears responsibility for crimes of others as an aider or abettor you will use the same test in determining whether or not the defendant had the specific intent to have willingly and knowingly associated himself with the criminal acts of another or others and to have willingly participated in them.

"If the defense asserted, causes you to have a reasonable doubt as to whether or not the defendant was so intoxicated as to be incapable of forming the necessary specific intent, you should find the defendant not guilty." (Emphasis supplied.)

## No. 33

"Voluntary intoxication is not a defense to a charge of aggravated assault, aggravated arson, aggravated criminal sodomy, rape, criminal damage to property or aggravated robbery.

"Voluntary intoxication however, may be a defense where the evidence indicates that a defendant acted only as an aider or abettor, and may be considered in determining whether such defendant was capable of forming the required intent to aid or abet the commission of aggravated assault, aggravated arson, aggravated criminal sodomy, rape, criminal damage to property or aggravated robbery."

## No. 34

This instruction was a laundry list of the various specific intent crimes charged and what the specific intent to be proven was.

Defendant's argument centers on the emphasized portion of instruction No. 32: "was utterly devoid of consciousness or awareness." Defendant contends this makes voluntary intoxication avail-

able only if the defendant is comatose and, since being both comatose and capable of doing any act is impossible, the defense is nullified. The complained-of language appears in *State v. Falke*, 237 Kan. 668, 683, 703 P.2d 1362 (1985), and *State v. Masqua*, 210 Kan. 419, 425, 502 P.2d 728 (1972), *cert. denied* 411 U.S. 951 (1973). We hereby disapprove of the inclusion of that phrase. However, in reviewing the totality of the instructions on voluntary intoxication, which constitute virtually an anthology of every case law statement on the subject without regard to recent modifications made in the defense, we conclude that no reversible error has been shown.

Finally, defendant contends the trial court erred in not instructing the jury on second-degree murder and voluntary manslaughter. The defendant was charged alternatively with first-degree premeditated murder and first-degree felony murder. The defendant was convicted of first-degree premeditated murder. It is unclear from the record, or the defendant's brief, whether the lesser offense instructions were requested only as to the alternative felony-murder charge or on the premeditated murder charge as well.

We shall first consider the issue as it relates to felony murder. When murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses ordinarily does not apply. The felonious conduct is held tantamount to the elements of deliberation and premeditation which are otherwise required for first-degree murder. It is only when the evidence that the underlying felony was committed is weak, inconclusive, or conflicting that instructions on lesser included offenses may be required. *State v. Bailey*, 247 Kan. 330, Syl. ¶ 2, 799 P.2d 977 (1990), *cert. denied* 114 L. Ed. 2d 108 (1991).

Defendant's claim that the evidence of the underlying felonies was weak or inconclusive rests solely on his claim that voluntary intoxication prevented him from having the specific intent required for the commission of some of the underlying felonies. The underlying felonies were instructed as being aggravated burglary, aggravated robbery, rape, aggravated sodomy, and aggravated kidnapping. Defendant was convicted of each of these charges, and no challenge has been made to the sufficiency of the evidence supporting said convictions. We note that rape and

sodomy are not specific intent crimes, so voluntary intoxication was a factor only on the aiding and abetting aspect of each. The jury was presented with the voluntary intoxication defense and rejected it in convicting defendant of the underlying felonies. Felony murder, itself, is not a specific intent crime. Additionally, defendant was found guilty of premeditated murder, not felony murder. Under these circumstances, it is difficult to see how the failure to give such instructions could have affected the outcome of the trial.

As for failure to instruct on the lesser degrees on premeditated murder, there was abundant evidence of premeditation. Sylvester Johnson and Rose Ann Johnson were kidnapped from Sylvester's apartment. While at the apartment, Sylvester was repeatedly stabbed and told he was going to die "tonight." In the automobile in which the Johnsons were transported, Sylvester testified one of the perpetrators (Harabia Johnson) asked if they had anything with which to kill both victims. Defendant herein responded, "Yeah, we got something to kill them with." After Sylvester escaped, Rose Ann was taken to the park, raped, and stomped to death. As we said in *State v. Bailey*, 251 Kan. 156, 834 P.2d 342 (1992), "The manner of Rose Ann's death and the fact blood was found in more than one location indicates her death was the result of a lengthy and intentional series of acts. No evidence was introduced to indicate Rose Ann's death was not premeditated first-degree murder." 251 Kan. at 165.

## PEREMPTORY CHALLENGE

Defendant's next issue complains of the State's exercise of a peremptory challenge to remove the only black male, Randy Harper, from the jury panel.

In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court held: (1) The equal protection clause forbids a prosecutor to peremptorily challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable to impartially consider the prosecution's case against a black defendant; (2) a criminal defendant may establish a prima facie case of purposeful racial discrimination in the selection of the jury based solely on evidence concerning the prosecutor's exercise of per-

emptory challenges at the defendant's trial, without showing repeated instances of such discriminatory conduct over a number of cases; and (3) once a defendant makes such a prima facie showing, the burden shifts to the prosecution to come forward with a neutral explanation for challenging the jurors which relates to the particular case to be tried. 476 U.S. at 89, 95, 97.

The *Batson* rule has since been reiterated. See *Hernandez v. New York*, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991); *Powers v. Ohio*, 499 U.S. 400, 409, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991).

In *Hernandez*, the Court further expanded on the three-step *Batson* rule as follows:

1st step: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." 352 U.S. at 359.

2nd step: "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." 352 U.S. at 360.

3rd step: A trial court's finding on the issue of discriminatory intent should not be set aside unless clearly erroneous. 352 U.S. at 369.

In *State v. Walker*, 252 Kan. 117, Syl. ¶ 2, 834 P.2d 203 (1992), we held:

"Appellate review of a trial court's determination of whether the prima facie showing required by *Batson v. Kentucky*, 476 U.S. 79, 96, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), has been made is plenary as it involves a question of legal sufficiency. In contrast, appellate review of a trial court's acceptance of the State's announced reasons for removal of a juror as being racially neutral is on the basis of abuse of discretion. Following *State v. Sledd*, 250 Kan. 15, Syl. ¶ 2, 825 P.2d 114, *cert. denied* 121 L. Ed. 2d 98 (1992)."

When defense counsel objected to the removal of Harper, the State advised it had taken the action based upon Harper's voir dire answers that: (1) He knew a number of the police officers; (2) he knew the case detective (to be called as a trial witness);

and (3) he knew one of the prosecutors. The trial court questioned the prosecutor about possible racially motivated reasons for such removal and then held the reasons for Harper's removal were race-neutral.

Defendant contends that once the reasons are expressed, inquiry must be made to see if any white juror left on the panel has characteristics similar to those asserted by the State as reasons for the black juror's removal. Presumably, this would entail reopening voir dire for fishing-type inquiries. We know of no such requirement. Specifically, defendant argues a white female juror was left on who indicated similar characteristics. This juror had stated only that one of her best friends was a police officer. There was no indication she knew any officer connected with the case or any of the prosecutors involved herein.

We find no error or abuse of discretion in the trial court's handling of the matter or its holding that the State had exercised its peremptory challenge of Harper for race-neutral reasons.

## CONSTITUTIONALITY OF "HARD 40"

For his next issue, the defendant contends that the only aggravating sentencing factor found by the jury herein is impermissibly vague and, accordingly, is violative of the Eighth Amendment to the United States Constitution's prohibition against cruel and unusual punishment. The aggravating sentencing factor at issue is that "[t]he defendant committed the crime in an especially heinous, atrocious or cruel manner." K.S.A. 1991 Supp. 21-4625(6).

A similar challenge to this aggravating sentencing factor was made in *State v. Bailey*, 251 Kan. 156. In *Bailey*, we discussed the enactment of the hard 40 legislation and, further, noted that case law involving claims of cruel and unusual punishment in death penalty situations is of limited assistance in other situations. We then concluded:

"In support of his position, defendant cites *Maynard v. Cartwright*, 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988), wherein the same language in a *death penalty statute* was held to be unconstitutionally vague. However, a later decision by the Court of Criminal Appeals of Oklahoma in *Foster v. State*, 779 P.2d 591 (Okla. Crim. 1989), noted the unconstitutional vagueness problem in *Maynard v. Cartwright* and held that the vagueness problem was satisfied with the inclusion of an additional instruc-

tion to the jury that the 'term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the sufferings of others.' 779 P. 2d at 592. The *Foster* definitions of heinous, atrocious, and cruel were included verbatim in the trial court's instructions to the jury herein.

"We find the contention that this aggravating factor is unconstitutionally vague in the context of the hard 40 legislation to be without merit and especially so in light of the definitions included in the instructions herein. It would be impossible to devise a laundry list of particular forms of killing that would encompass the intended subject. Thus, the statute has to rely on adjectives. As applied to the facts herein, there is no problem either. The forensic evidence established major trauma to virtually all parts of Rose Ann's body. There was no estimate of how many times she was stomped upon. Blood found in multiple locations also established a lengthy period of assault and a slow death. The adjectives heinous, atrocious, and cruel are extremely apropos herein. This is certainly no borderline case for the application of this factor." 251 Kan. at 174.

In the case before us the jury was instructed:

"DEFINITIONS: 'Heinous'—extremely wicked or shockingly evil.

'Atrocious'—outrageously wicked and vile.

'Cruel'—pitiless or designed to inflict high degree of pain, utter indifference to or enjoyment of sufferings of others as where death of victim was preceded by torture or serious physical abuse."

We conclude *Bailey* is controlling on this issue.

## HARD 40 NOTICE REQUIREMENT

For his next issue, defendant contends the notice requirement set forth in K.S.A. 1991 Supp. 21-4624(1) was not complied with and the hard 40 sentence is thereby invalid. The statute provides:

"If a defendant is charged with murder in the first degree, the county or district attorney shall file written notice if such attorney intends, upon conviction or adjudication of guilt of the defendant, to request a separate sentencing proceeding to determine whether the defendant should be required to serve a mandatory term of imprisonment of 40 years. *Such notice shall be filed with the court and served on the defendant or the defendant's attorney at the time of arraignment. If such notice is not filed and served as required by this subsection, the county or district attorney may not request such a sentencing proceeding* and the defendant, if convicted of murder in the first degree, shall be sentenced as otherwise provided by law, and no mandatory term of imprisonment shall be imposed hereunder." (Emphasis supplied.)

The record reflects that on July 23, 1990, defendant was charged in 90-CR-1324 and served with the notice. On August 17, 1990, defendant was bound over and arraigned. No notice was served. On August 22, 1990, case No. 90-CR-1324 was dismissed by the State and, on the same day, case No. 90-CR-1516 was filed. The charges included the murder of Rose Ann Johnson. Notice was given at that time. Notice was also served at the time of arraignment on the new case. Defendant contends that the failure of the State to serve the notice at the arraignment in case No. 90-CR-1324 is a fatal flaw to the sentencing herein. We do not agree.

A virtually identical issue was raised in *State v. Bailey*, 251 Kan. 156, wherein we said:

"In his brief, defendant states he was arraigned in that case on July 23, 1990. This cannot be correct as the murder occurred July 21, 1990. Even with the implementation of court delay reduction procedures, the process could not have moved that rapidly. A more likely date for arraignment is August 17, 1990, which is the date mentioned in the hearing on the motion to dismiss the notice held October 12, 1990. One of the problems with using that date is that the defense counsel asserting it is not defendant's counsel, but rather Richard Ney, attorney for James Walker. There is nothing in the record before us establishing that defendant herein and Walker were arraigned at the same time. Defense counsel for Bailey, our defendant herein, joined in Ney's motion to dismiss, so we will assume August 17, 1990, is the date of arraignment in 90 CR 1324. It would further appear from the transcript of that hearing that a 21-4624(1) notice was attached to the complaint/information filed in 90 CR 1324. The State argued therein, and defense counsel did not dispute, that the defense was aware of said notice prior to the preliminary hearing. The argument made by defense counsel was not surprise or prejudice, rather that the statute was not technically complied with inasmuch as a copy of the notice was not served upon defendants at the *arraignment.*

"In the record before us is a journal entry of dismissal which dismissed 90 CR 1324 without prejudice on August 22, 1990. On the same day 90 CR 1516, which contains the same murder charge, was filed. The purpose of this, the State says, was to add some new charges relative to a different incident and to avoid any problems on the 21-4624(1) notice. Arraignment on the new case was had on September 13, 1990. A 21-4624(1) notice was served at that arraignment.

"Defendant argues that the State, by statute, has one chance to file a notice invoking the so-called "hard 40" and by not doing so by serving a copy of same at the arraignment in 90 CR 1324, the opportunity is forever gone. Further, the State cannot correct its error by dismissing and refiling.

. . . .

". . . K.S.A. 1991 Supp. 21-4624 *et seq.* sets forth a lengthy and complex statutory scheme covering all aspects of the hard 40 procedure. The possibly severe consequences to a defendant were not intended to be a last-minute surprise or a matter of conjecture. If faced with a hard 40 prospect, a defendant should be aware of it and be able to plan his or her strategy accordingly. Notice at the time of arraignment serves this purpose. Under the facts before us, no prejudice has been shown to defendant in any respect and no legislative purpose is shown to have been defeated or impaired." 251 Kan. at 167-69.

*Bailey* is controlling on this issue.

## ERRORS IN HARD 40 PROCEEDING

For his final argument, defendant contends he was denied due process of law because: (1) He was not allowed to present evidence crucial to his theory of mitigation; (2) the trial court erred in refusing to instruct on his specific theories of mitigation; and (3) the trial court's instructions failed to "instruct the jury in a manner which would adequately implement the new sentencing statute." Each is considered in turn.

Defendant contends that the district court's exclusion of the testimony of Dr. Sayed Jehan and medical records of the defendant's mother were a breach of judicial discretion. We do not agree.

At the sentencing proceeding, Stephen Gray, a child custody investigator, testified defendant's mother had a history of treatment for nervous conditions. Defendant then attempted to introduce, through Dr. Jehan, evidence of Ms. Walker's mental condition and treatment. Ms. Walker was present and asserted her claim of physician-patient privilege. The State challenged whether or not the witness had relevant testimony to offer and was permitted a preliminary examination of the witness. The following occurred as a part thereof:

"[State's attorney]: Have you ever had the occasion to do a psychological or psychiatric analysis on any individual by the name of James Walker?
"A. No. I haven't.
. . . .
"[State's attorney]: Do you know what bearing, if any, your analysis or findings have to do with a Mr. James Walker?
"A. I don't know at this time."

The trial court upheld the claim of privilege and, further, held the witness had no relevant testimony to offer relative to James Walker.

We need not consider the claim of privilege. The record reflects the following exchange took place among defense counsel, the court, and Dr. Jehan:

"THE COURT: . . . And, further, Dr. Jehan has stated that he doesn't have any opinion about James Walker. The fact is that it is no defense for James Walker, not a matter in mitigation that his mother suffered a lot of heartache and depression as a result of things that have happened in her life.

"MR. NEY: Well—

"THE COURT: He is the one responsible for his conduct, and if he wants to testify about his turbulent life, he's perfectly free to do so. But this is not an appropriate way to go about it, and my ruling stands.

"MR. NEY: Well, Your Honor, we contend that this is appropriate evidence relating to his life. If his mother was hospitalized, as we said, 13 separate times during this time for mental illness—

"THE COURT: Well, you're just repeating what's privileged to her without the authority to repeat it. Now, you've got a proffer of those medical records, and you have a proffer that, if permitted to do so, Dr. Jehan would say that couldn't help but affect other members of the family. But I don't think you can say in what way, can you?

"THE WITNESS: No, sir.

"THE COURT: I didn't think so. So that's my ruling."

K.S.A. 1991 Supp. 21-4624(3) provides in part:

"In the sentencing proceeding, evidence may be presented concerning any matter that the court deems relevant to the question of sentence . . . . Any such evidence which the court deems to have probative value may be received . . . ."

Relevant evidence is statutorily defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). "Relevancy is more a matter of logic than of law. Evidence is relevant if it renders the desired inference more probable than it would be without the evidence or has any tendency in reason to prove a material fact." *State v. Faulkner*, 220 Kan. 153, Syl. ¶ 6, 551 P.2d 1247 (1976). The admission of evidence rests within the sound discretion of the trial court subject to the exclusionary rules. *State v. Carmichael*, 240 Kan. 149, 157, 727 P.2d 918 (1986).

K.S.A. 1991 Supp. 21-4626 provides:

"Mitigating circumstances shall include, but are not limited to, the following:

"(1) The defendant has no significant history of prior criminal activity.

"(2) The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances.

"(3) The victim was a participant in or consented to the defendant's conduct.

"(4) The defendant was an accomplice in the crime committed by another person, and the defendant's participation was relatively minor.

"(5) The defendant acted under extreme distress or under the substantial domination of another person.

"(6) The capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired.

"(7) The age of the defendant at the time of the crime.

"(8) At the time of the crime, the defendant was suffering from post-traumatic stress syndrome caused by violence or abuse by the victim."

Clearly, none of the statutorily set forth mitigating factors encompass the defendant's mother's medical history. The fact, standing alone, that the defendant's mother may not have been a stable, warm, and nurturing parent is hardly a factor mitigating defendant's role in the stomping of Rose Ann Johnson to death.

For whatever weight the jury wished to afford it, the jury, through the testimony of Stephen Gray, did hear testimony that Ms. Walker had a history of treatment for a nervous condition, conditions at the Walker home deteriorated after the defendant's father died, and the Walker family never really recovered from the death of the defendant's father.

The record is clear that Dr. Jehan had no relevant evidence to offer relative to defendant. He did not even have an opinion as to how the mother's medical history might have affected defendant's action on the day in question. Without expert testimony tying Ms. Walker's medical records to some relevant issue, their admission would serve no valid purpose. We find no abuse of discretion in the claimed particulars.

Next, defendant contends the trial court erred in refusing to instruct the jury specifically that the defendant's cooperation with the police after his arrest and his undesirable childhood situation could be considered as mitigating factors.

The court's instruction set forth the statutory mitigating factors claimed to be applicable and that mitigating circumstances were

not limited to those factors. Defense counsel was free to argue additional mitigating circumstances and tell the jury it could consider those circumstances in accordance with the court's instruction.

It is difficult to see how cooperation with the police after arrest for the commission of a crime is mitigation for having committed the crime. As discussed in the preceding point, the fact defendant's mother may not have been a good stable parent is difficult to consider as a mitigating factor in the vicious killing of an individual who played no role in the defendant's upbringing.

In any event, we find no error in the trial court's refusal to give an instruction specifically stating these two claimed mitigating factors could be considered by the jury.

For his final point, defendant argues that the trial court erred in refusing to give a number of proposed instructions in the sentencing proceeding relative to burden of proof, reasonable doubt, and presumption of innocence of aggravating factors.

The jury was instructed, in part:

"SUPPLEMENTAL INSTRUCTION CONCERNING PENALTY

"Ladies and Gentlemen of the jury, defendant has been convicted of Premeditated Murder in the First Degree. Now it is for you, to determine the appropriate penalty.

"In making this determination you may consider all the evidence, both that admitted in the trial in which guilt was determined and in this hearing in which additional evidence has been presented.

"If, by unanimous vote, you find beyond a reasonable doubt, one or more aggravating circumstances to exist, and find further the existing circumstance or circumstances not to be out-weighed by any mitigating circumstance or circumstances you may find to exist; then, the defendant shall be sentenced to imprisonment for Life and shall not be eligible for parole before serving forty (40) years imprisonment, which shall not be reduced by the application of good time credits.

"Aggravating circumstances you may consider shall be limited to the following:
[Five statutory aggravating factors were listed, followed by previously stated definitions of heinous, atrocious, and cruel.]

"Mitigating circumstances you may consider shall include but not be limited to the following:

"1. The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances.

"2. The defendant was an accomplice in the crime committed by another person, and the defendant's participation was relatively minor.

"3. The defendant acted under extreme distress or under the substantial domination of another person.

"4. The capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired.

"5. The age of the defendant at the time of the crime.

"If you find one (1) or more aggravating circumstances exist, and do not find any mitigating circumstances or, do find mitigating circumstances but find mitigating circumstances to not out-weigh aggravating circumstances; then, your verdict shall recommend a mandatory forty (40) year minimum sentence.

"If this is the sentence imposed, the sentence will be for Life without eligibility for parole before serving forty (40) years without deduction for good time credit.

"If you find no aggravating circumstances, or find one (1) aggravating circumstance (or more) but find circumstances in mitigation out-weigh aggravating circumstances, then the sentence will be (imposed by the Judge) Life imprisonment with eligibility for parole after fifteen (15) years with no deduction for good time credit.

"Your verdict must not be imposed under the influence of passion, prejudice or any other arbitrary factor.

"It is your duty to deliberate, reason together, and listen to the arguments of each other with an open mind."

Clearly, the jury was instructed that for an aggravating factor or factors to be found, the jury must do so unanimously and beyond a reasonable doubt. No such requirement is set forth as to mitigating factors. Defendant contends the absence of such requirement as to mitigating factors should have been spelled out in a specific instruction. We do not agree. We believe that the instructions as given adequately state the law in this regard.

Defendant further claims a presumption of innocence instruction should have been given relative to aggravating factors. We do not agree. The jury was properly instructed that the burden of proof as to aggravating factors was beyond a reasonable doubt. This was sufficient.

Little would be gained from listing each of the numerous instructions proposed by defense counsel. Each has been carefully considered. Many are repetitious and, if given in their totality, would be confusing to a jury. We are satisfied that the instructions given adequately stated the law under the circumstances herein. In so doing, we are not approving these instructions as a model

to be used in other cases. Attention is directed to the hard 40 instructions set forth in PIK Crim. 2d 56.01 A-G (1992 Supp.).

The judgment is affirmed.