No. 77,143

STATE OF KANSAS, *Appellee*, v. KENNETH A. GARDNER, *Appellant*.

(955 P.2d 1199)

Opinion filed March 6, 1998.

*Steven R. Zinn*, deputy appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Jerome A. Gorman*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Kenneth A. Gardner, from his jury convictions of murder in the first degree

(K.S.A. 21-3401); aggravated robbery (K.S.A. 21-3427); arson (K.S.A. 21-3718); and aggravated burglary (K.S.A. 21-3716).

The trial court sentenced Gardner to life without the possibility of parole for 25 years for the first-degree murder conviction, and the court imposed the following sentences for the remaining convictions: 77 months for aggravated robbery, 34 months for aggravated burglary, and 19 months for arson. The court ordered the sentences to run consecutively for an effective term of life (with no parole for at least 25 years) plus 130 months. Gardner timely appealed his convictions to this court based on three trial errors.

Gardner contends that the trial court erred in admitting into evidence a pair of his bloodstained jeans and boots and in excluding part of a witness' testimony as hearsay and lacking in foundation. Gardner also contends the prosecutor made an improper closing argument.

The victim in this case, Vernon Flynn, resided at the home of his uncle, Bobby Flynn, in Kansas City, Kansas. Bobby worked a 12-hour night shift, starting at 5 p.m. and getting off at 5:30 a.m. Vernon worked days, getting off at around 5 p.m. When Bobby left for work on May 1, 1995, at 4 p.m., Vernon was home and his small, red Isuzu truck was parked on the gravel area to the side of the driveway. This is where Vernon usually parked his truck.

Vernon's cousin, Kevin Brandon, talked to Vernon at approximately 8:30 p.m. on May 1, 1995. According to Kevin, Vernon seemed fine. Bobby returned home from work at approximately 7:30 a.m. on May 2, 1995. He noticed the garage door open a couple of feet. When he opened the garage door all the way, he saw Vernon's truck parked in the garage. Bobby entered the house through the garage. He saw soot and a substance running down the wall, which he later identified as blood and brain matter. Bobby found Vernon's body on the floor, with a quilt covering most of Vernon's upper body. Bobby looked beneath the quilt and saw that most of Vernon's head was gone. Bobby realized that the soot was not traveling in the air, but was settled. Bobby then realized that a fire had been set in the house but that it was no longer an active fire. Bobby called 911 and waited for the emergency crews in the front yard.

Two fires had been set in the Flynn house in two separate bedrooms. Each of the fires burned itself out before Bobby arrived home, without having to be extinguished by the fire department. This occurred because the house was shut up tight and the fires consumed all the available oxygen.

A forensic pathologist reconstructed the victim's head during an autopsy and determined that there was a gunshot wound behind the left ear. Death would have been instantaneous. There were also multiple fracture lines in the back of the skull, indicating that there had been a blow to the head prior to the gunshot.

Bobby told the police that there were numerous weapons of different calibers in the house. All the weapons were accounted for except for a British Enfield .303 caliber rifle. Other property from the house and garage was also missing, including a VCR, a skill saw, a drill, a battery charger, a roller tool box, a regular tool box that fits on top of the roller tool box, and a spare tool box that contained miscellaneous wrenches, sockets, wire cutters, screwdrivers, and vise grips. The police also discovered that speakers and a stereo system were missing from Vernon's truck.

Bobby told the police that two people had been at his house sometime during the week prior to the homicide. One of these persons was Gardner, who came to visit Bobby and help him fix his truck.

On May, 1, 1995, Gardner had been living at the home of Gerald Nelson in Overland Park, Kansas, for about 2 weeks. Nelson was the maternal step-grandfather of Gardner's child. Before the murder, Nelson had a discussion with Gardner regarding some of Nelson's tools which were missing. Nelson told Gardner to replace the tools before Gardner came home again. That night, Gardner did not return home. However, the next day Nelson found some different tools in his home, and Gardner said that the tools were meant to partially replace Nelson's missing tools.

Michael Hurtado, a friend of Gardner's, testified that on the evening of May 1, 1995, Gardner came by his house around 9 or 10 p.m. According to Hurtado, Gardner was wearing a white tank top, blue jeans, and a pair of boots. Gardner borrowed a sweatshirt from Hurtado, which Hurtado has not received back. Hurtado tes-

tified that Gardner asked for a ride, although Gardner did not specify where he wanted to go at first. Hurtado agreed to give Gardner a ride, and Hurtado woke up his girlfriend, Nettie Gordon, who decided to go with them. Gardner pointed the way to go. Gardner told Hurtado to go to a gas station so Gardner could use the pay phone. Hurtado pulled over at the gas station, and Gardner used the phone for about 1 minute. Hurtado and Nettie remained in the car and did not hear any of the conversation.

About 1 minute after Gardner got off the phone, Nettie saw a "little red truck" drive by. The victim drove a red Isuzu pickup truck. Nettie testified that Gardner "started laughing and said he [had] just called that guy to go pick him up at 111th Street and boy, was he going to have a rude awakening when he came home." Hurtado dropped Gardner off after driving a little further. The exact location where Hurtado and Nettie dropped Gardner off is in dispute, but Nettie showed the police a location which was ½ block from the victim's home.

Hours later, between 2 and 2:30 a.m. on May 2, 1995, Gardner called David Liter at home. Liter had known Gardner for about 10 years. Gardner asked Liter if he could come by and store some tools at Liter's residence. Liter agreed to this over the phone, and Gardner arrived at Liter's house alone about 20 or 30 minutes later. He arrived in a red Isuzu pickup truck, which he parked in Liter's driveway. Gardner was wearing blue jeans, and Liter did not see any blood on him. Liter helped Gardner unload the truck, which held four tool boxes, a skill saw, a battery charger, speakers, a VCR, a car CD player/radio, an equalizer, an amplifier, and some CDs. Gardner denied that the property was stolen. Before Gardner left, Liter saw the barrel of a rifle behind the seat area of the truck. Liter inquired about purchasing the rifle, but Gardner said that he already promised the rifle to somebody else.

Gardner arrived at Hurtado's house again. He asked to sleep there, but Hurtado said there was no space. Hurtado told Gardner to ask Clyde Davis for a place to sleep. Gardner arrived at Clyde Davis' house around 4 a.m. on May 2, 1995. Davis let Gardner sleep on his couch for a few hours. Davis said that Gardner was wearing blue jeans and logging boots that laced all the way to the

toe. He indicated that Gardner was dressed "nice and neat." The next morning, Davis gave Gardner a ride back to Liter's house. After Gardner and Liter sorted through the tools, Gardner took some of the tools over to Nelson's house—the place where Gardner had been living and the place where he had to replace some tools before he could return again. Liter and Gardner then returned to Liter's house. They loaded up the rest of the equipment and took it to Hurtado's house to sell, which they did. Sometime between the evening of May 1, 1995, and the next afternoon, Gardner shaved off his beard.

Because Bobby Flynn said Gardner had visited him during the week prior to the homicide, a policeman went to the Nelson residence to speak with Gardner on the afternoon of May 3, 1995. Gardner was not home, but the policeman saw a red tool box sitting in the hallway of the Nelson home. Over the following week, the policeman recovered property from the Nelson residence, including a battery charger, a cordless drill, a circular saw and blade, an electric drill, a triangular file, an abrasive disc, an extension bar for a wrench, a magnetic tool, and a set of sockets. The police also recovered a VCR which Gardner had sold to someone at Hurtado's house, and Bobby Flynn identified the VCR as belonging to him. Later, Nelson's wife found a pair of Gardner's boots under a step in the Nelson house leading from the garage to the utility room. Nelson turned the boots over to the police. The police tested the boots and found human blood in two different locations on the left boot. The police also tested a pair of Gardner's jeans and found two stains of human blood on the outside left leg. Additional tests on both items were unsuccessful because the blood samples were small, old, and contaminated by dirt and dyes.

Further, hair analysis was performed on hair recovered from the victim's (Vernon Flynn's) hands. Experts were unable to match the hair to any particular person. The hair did not match Gardner's hair. A comparison of the hair to Vernon's hair was inconclusive. The hair analyst found numerous inconsistencies, including racial inconsistencies, between the recovered hair and Vernon's hair. The hair analyst testified that a comparison of the sample hair to Ver-

non's hair was difficult because most of Vernon's hair was destroyed by the gun blast.

A man and his son who had been walking by a creek close to the Flynns' home found a British Enfield .303 caliber rifle in the creek on May 5, 1995, and turned it over to the police the next day. A firearms examiner stated that bullet fragments recovered from the Flynns' house had been fired from a .303 caliber British rifle. He said the marks on the bullet fragments were consistent with marks on a test bullet fired from the British rifle. However, the firearms expert testified that he could not conclusively say the bullet fragments recovered from the crime scene had been fired from the rifle found in the creek.

Gardner told the police that he did not take any property from the Flynns' house or kill Vernon Flynn. Rather, Gardner stated that on the night of the crime, he was at a "dope house." When he was leaving the dope house, Gardner claimed, a man approached him and offered him some tools in exchange for an "eight ball." Gardner accepted the deal. Then, Gardner states, this man allowed Gardner to use the man's truck, a red Toyota pickup, to drive the tools over to Liter's house by himself. Gardner told the police that after he dropped the tools off at Liter's house, he returned the truck to the man at the drug house. Gardner indicated that he traded for tools all the time. Then, Gardner claims, the unknown man drove him to Hurtado's house in a different vehicle.

The jury did not believe Gardner's alibi. Further facts will be discussed as they become relevant.

## I. BLOODSTAINED JEANS AND BOOTS

During the trial, the assistant laboratory director for the Johnson County Criminalistic Laboratory testified that he examined a pair of Gardner's blue jeans and found two small drops of blood on the outside left leg of the jeans. A blood analyst testified that her testing revealed that the blood on the jeans was human in origin. Likewise, two spots of human blood were detected on a pair of Gardner's boots (the left boot), but further testing was inconclusive. The blood analyst stated that there were additional tests which could have been performed by other agencies, specifically Cellmark and

Gene Screen, but the evidence was not submitted to those agencies for further testing.

At the close of the State's case, the State moved to admit the jeans and boots into evidence. Defense counsel objected, stating that the boots and jeans had not been sufficiently identified. The trial court overruled the objection and admitted the items into evidence.

The defense counsel called Clyde Davis as a defense witness. Davis testified that Gardner was *not* wearing the jeans in question when he came to Davis' house in the early morning hours of May 2, 1995. Davis stated that Gardner was dressed "nice and neat," while the jeans at issue were filthy.

Gardner concedes that there was testimony he was wearing jeans and logging boots in the late evening of May 1 and the early morning hours of May 2. However, Gardner points out that there was no evidence the jeans and boots introduced into evidence were the actual clothes he wore on May 1 or 2. None of the witnesses were specifically asked to identify the boots admitted into evidence as the same ones worn by Gardner on May 1 or 2. Further, none of the witnesses were specifically asked to identify the jeans admitted into evidence as the same ones worn by Gardner on May 1 or 2. In fact, Davis specifically testified that the jeans at issue was *not* the pair of jeans worn by Gardner on May 2. Moreover, there was evidence that Gardner was a mechanic, a job in which it is not uncommon to sustain minor cuts, resulting in the presence of blood on one's clothing. Thus, Gardner claims the jeans and boots were irrelevant evidence which was improperly admitted into trial.

In support of his position, Gardner cites *State v. Walker*, 239 Kan. 635, 722 P.2d 556 (1986). In *Walker*, the defendant was charged with a shooting murder. The defendant's home was searched, and several items of clothing were taken to determine whether the clothing contained bloodstains. A KBI forensic examiner tested the clothing. The tests indicated blood on four of the items examined, but the tests were inconclusive as to whether the blood was of human or animal origin. Further, the forensics examiner could not determine how long the bloodstains had been on the clothing or whether all the stains came from the same

source. The clothing was admitted into evidence at trial, and the forensic examiner testified regarding the clothing. The State wanted the jury to infer that the blood on the clothing was the victim's blood.

However, no one testified regarding what type of clothing the defendant was wearing on the night of the shooting. Thus, the *Walker* court found that there was no evidence to connect the blood found on the defendant's clothing with the shooting of the victim. Since there was no logical connection between the clothes and the suggested inference that the blood on the clothes originated from the victim, this court held in *Walker* that the clothing evidence was irrelevant. This court concluded that the trial court was in error to admit the bloodstained clothing into evidence at trial. However, the *Walker* court found that the improper admission of the evidence was harmless error because other substantial and uncontroverted evidence of the defendant's guilt existed.

Unlike the *Walker* case, the State presented evidence of the clothes worn by Gardner during the time the crimes occurred, which matched the description of the bloodstained clothing at issue. Thus, there was some evidence presented at trial which indicated a connection between Gardner's bloodstained jeans and the murder of Vernon Flynn. For instance, Hurtado testified that when Gardner came over to his house on the evening of May 1, 1995, Gardner was wearing a white tank top and blue jeans. Liter testified that Gardner was wearing blue jeans when Gardner came over to Liter's house in the early morning hours of May 2, 1995. Vernon Flynn was killed sometime between the evening of May 1, 1995, and the morning of May 2, 1995.

Experts at the murder scene testified that blood and body parts were splattered everywhere. One expert testified that it would be reasonable to find blood on the shooter's clothing.

One detective specifically testified that the bloodstained jeans at issue were removed from Gardner the night of his arrest on May 6, 1995. The State acknowledges Davis' testimony in which he stated that the jeans at issue were not the ones Gardner wore on May 2, 1995, because those jeans were neat and clean and the jeans at issue were filthy. However, the State points out that during

cross-examination, Davis admitted that he had no idea when the jeans at issue became dirty. The State contends that it is reasonable to assume Gardner wore the jeans from May 2, when he shot the victim and got blood on them, to May 6, when he was arrested. In this case, the same jeans could have been neat and clean when Davis saw them on May 2, and become filthy from constant wear by the time Gardner was arrested on May 6. Gardner works on cars, thus exposing his clothing to dirt and grime.

Further, there was evidence presented at trial to indicate a connection between Gardner's bloodstained boots and the murder of Vernon Flynn. The police recovered the bloodstained boots on May 8, 1995, from Gerald Nelson's house, which is where Gardner had been residing. Nelson's wife found the boots under a step leading from the garage to the utility room, and Nelson turned the boots over to the police. Hurtado testified that when Gardner came over to his house on the evening of May 1, 1995, Gardner was wearing boots. Davis testified that when he saw Gardner in the early morning of May 2, Gardner was wearing logging boots that laced all the way down to the toe. Davis' description of the boots Gardner was wearing on May 2, 1995, matches the bloodstained boots found in Nelson's home. Further, the boots were found in an unusual place in the Nelson home—under a step leading from the garage to the utility room. See *State v. Nicholson*, 225 Kan. 418, 590 P.2d 1069 (1979) (affirming trial court's admission of evidence into trial because the items were found in an unusual place and were the same type of items used in the charged crime).

Finally, there is evidence placing Gardner inside the victim's home during the time the witnesses saw him wearing jeans and boots which match the description of the bloodstained exhibits. For instance, Liter testified that the truck which Gardner used to transport the tools to his house was the victim's truck. Bobby Flynn found that truck inside the garage. The garage connects to the room where the victim was found dead.

A trial court's ruling regarding the admission of evidence is subject to an abuse of discretion standard of review. *State v. Vaughn*, 254 Kan. 191, 204, 865 P.2d 207 (1993).

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. . . . If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. Judicial discretion must thus be considered as exercisable only within the bounds of reason and justice in the broader sense and be considered abused only when it plainly overpasses those bounds." *State v. Stallings*, 262 Kan. 721, Syl. ¶ 6, 942 P.2d 11 (1997).

Under K.S.A. 60-401(b), relevant evidence is evidence "having any tendency in reason to prove any material fact." "For evidence of collateral facts to be competent, there must be some material or logical connection between them and the inference or result they are designed to establish." *State v. Walker*, 239 Kan. at 644.

" 'The admissibility of physical evidence . . . is to be determined on the basis of its relevance in connection with the accused and the crime charged. [Citations omitted.] . . . The determination of relevancy is a matter of logic and experience, not a matter of law. [Citations omitted.] Furthermore, when a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it. [Citation omitted.]' " *State v. Garcia*, 243 Kan. 662, 676, 763 P.2d 585 (1988), *overruled on other grounds State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992) (quoting *State v. Nicholson*, 225 Kan. 418, 419-20, 590 P.2d 1069 [1979]).

As a matter of logic and experience, the bloodstained jeans and boots are connected to Gardner and the murder charge. Witnesses testified that they saw Gardner in jeans and boots, matching the description of the evidence at issue, around the same time the murder occurred. The crime scene was splattered with blood. Davis saw Gardner driving the truck that ended up at the crime scene. The blood spots on the exhibits in question tested positive as human blood. The trial court properly admitted the jeans and boots into evidence for such weight and effect as the jury saw fit to give them. It is true that Davis testified the jeans at issue were not the jeans Gardner wore on the night the victim was killed because those jeans were neat and clean, while the jeans at issue were filthy. The jury heard this testimony and had the right to give it the weight and effect it saw fit, up to and including the point of disregarding the jeans and ignoring the blood spots. The jury also had the right to find that the jeans at issue were the same jeans Davis saw Gard-

ner wearing May 2, 1995, and that they had simply gotten dirty by constant wear over the course of the week until Gardner was arrested on May 6, 1995. Simply because the jury could weigh this evidence in a different way does not make it irrelevant.

The trial court properly admitted the bloodstained jeans and boots into evidence for the jury to assign them whatever weight they chose. Such admission was not arbitrary, fanciful, or unreasonable. Reasonable persons would take the view adopted by the trial court. The trial court did not abuse its discretion on this issue and was not in error. This issue fails.

## II. CLOSING ARGUMENT

Gardner contends that the prosecutor misstated the facts or presented facts which were not in evidence on three occasions during the State's closing argument. First, Gardner claims that the following statement made by the prosecutor in closing argument was improper: "You remember the testimony about the clothing from the house that there was boots and clothing *found under tools* that were taken from the house of the victim." (Emphasis added.) The defense counsel lodged a contemporaneous objection to this statement, but the trial court overruled it.

On appeal, Gardner contends that this statement is not supported by the evidence presented at trial. Gardner concedes that some of his clothes, including the boots, were found in the Nelsons' garage, and he also concedes that some of the victim's tools were found in the Nelsons' garage. However, Gardner argues that there was no evidence presented at trial as to the location of the clothes in relation to the tools. Nelson testified that his wife found the boots under a step in the garage, with some items over them, but he did not specify what those items were, and in particular he did not say that the boots were under any tools. Thus, Gardner claims that the prosecutor's statement was a misstatement of fact. Further, Gardner argues that this misstatement of fact was prejudicial to him because it improperly linked the bloodstained boots with the tools.

In Kansas, the prosecution is given considerable latitude in closing argument and in presenting its theory of the case to the jury.

*State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 (1991); *State v. Bird*, 238 Kan. 160, Syl. ¶ 14, 708 P.2d 946 (1985). However, "[n]o rule governing oral argument is more fundamental than that requiring counsel to confine their remarks to matters in evidence. The stating of facts not in evidence is clearly improper." *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994).

There was no evidence admitted at trial to indicate that the bloodstained boots found in the Nelson's home were covered up by the victim's tools. This comment, made in closing argument by the prosecutor, was a misstatement of fact. However, the misstatement of fact constitutes harmless error. In deciding whether improper remarks by the prosecutor during closing argument constitute harmless error, the reviewing court must be able to find beyond a reasonable doubt that the error had little, if any, likelihood of changing the result of the trial. *State v. Zamora*, 247 Kan. 684, 690, 803 P.2d 568 (1990). Such is the case here.

The jury heard testimony regarding the bloodstained boots and where they were found in the Nelson home. The jury heard testimony regarding Gardner's possession of tools owned by the victim and that some of these tools were found in the Nelson home. The fact that the tools and boots may not have been found in the same place in the Nelson home was of no real import. The State's improper allegation that the boots and tools were found in the same place in the home was not a significant part of the State's case. The State made the misstatement of fact in passing and did not rely on it as a significant part of its case. We hold that beyond a reasonable doubt, the prosecutor's misstatement of fact as to the location of the boots had little, if any, likelihood of changing the jury's decision or the result of the trial.

In regard to the two other claimed "misstatements of fact" which are challenged on appeal, Gardner did not contemporaneously object to these statements when they were made at trial. "An issue not presented to the trial court will not be considered for the first time on appeal." *State v. Alderson*, 260 Kan. 445, Syl. ¶ 7, 922 P.2d 435 (1996); see also *State v. Boyd*, 257 Kan. 82, 89, 891 P.2d 358 (1995)(timely objection necessary to give the trial court an opportunity to correct alleged trial errors). Gardner acknowledges that

he did not object at trial to two of the statements challenged on appeal. However, Gardner contends that the court may address these statements based on *State v. Henderson*, 226 Kan. 726, 736-37, 603 P.2d 613 (1979). In *Henderson*, the defendant challenged on appeal some statements the prosecutor made in closing argument. The defendant had objected to some of these challenged statements at trial and had not objected to others. However, this court considered the unobjected-to statements "insofar as the cumulative effect of improper argument is concerned." 226 Kan. at 737. Gardner contends that this same rule should apply to this court's evaluation of the prosecutor's unobjected to misstatements of fact made in closing argument.

*Henderson* does not apply in this situation. In *Henderson*, the court found that the objected-to prosecutor's statement, which improperly commented on the defendant's constitutional right not to testify, was reversible error, independent of any other error. The court only pointed to the other, unobjected-to, prosecutor's statements as support for its decision to reverse the conviction based on the objected-to prosecutor's statement.

Here, the one "misstatement of fact" which Gardner properly objected to at trial did not constitute reversible error, as it did in the *Henderson* case. It only constituted harmless error. Harmless error cannot turn into a reversible error due to the cumulative effect of unobjected-to prosecutor's statements. As such, the other statements which Gardner cites on appeal, which were not properly objected to or preserved for appeal, will not be discussed herein. This issue fails.

## III. EXCLUDING TESTIMONY

Della Zimmerman, a witness for the State, lived in the house to the west of Bobby Flynn's house. Zimmerman testified that when she walked by the Flynn home about 6:15 a.m. on May 2, 1995, she smelled smoke. On cross-examination by defense counsel, Zimmerman stated that she often travelled by bus. She would usually get off of the bus at a stop which was 2½ blocks from her home and walk home from there. The defense counsel asked her if any unusual incidents occurred shortly after the homicide as she

walked home from the bus stop. Zimmerman answered "yes" to the question. At this time, the State requested a bench conference and made a relevancy objection. At the bench conference, the defense counsel stated that Zimmerman planned to testify that a male followed her as she walked home from the bus stop and said "repeat the killing." The court allowed the defense to continue the cross-examination on this subject matter.

Once questioning resumed, Zimmerman stated that on a day after May 2, 1995, while she was riding the bus, she became involved in a conversation with a man whom she indicated she would not be able to identify. This man said that he was from Denver and was involved in law enforcement. This man got off of the bus at her stop and followed about 3 feet behind Zimmerman. When Zimmerman started to testify about what the man said, the State made a hearsay objection. The defense counsel responded that the statement was not offered to prove the truth of the matter stated but was offered only to show that the statement had been made. The trial court ruled that the statement qualified as hearsay and that it lacked an adequate foundation. The trial court refused to allow Zimmerman to testify regarding the "repeat the killing" statement that the man who followed her made.

On appeal, Gardner challenges the trial court's ruling. Gardner alleges that Zimmerman's testimony about the "repeat the killing" statement was not hearsay. In making this argument, Gardner cites to K.S.A. 60-460, which defines hearsay as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." Gardner contends that he did not want to offer this statement to prove the truth of the matter stated. Rather, he only wanted to offer the statement to show that it had been made. As such, Gardner claims that the statement was not hearsay and should have been admissible. In support of his position, Gardner cites *State v. Getz*, 250 Kan. 560, Syl. ¶ 2, 830 P.2d 5 (1992), which provides:

"If an utterance previously made out of court is offered in evidence merely for the purpose of establishing what was then said, and not for the purpose of establishing the truth of the statement, the testimony is not hearsay. If relevant, it is admissible through the person who heard it."

Further, Gardner asserts that the trial court erred in finding that there was not an adequate foundation for the statement and in refusing to admit the statement on this ground. Gardner concedes that Zimmerman could not recall the exact date on which the statement was made and indicated that she would not be able to identify the male who made the statement. However, Gardner points out that Zimmerman did indicate the statement was made following the homicide and occurred while she was walking home from the bus stop, which is close to her home and the Flynn home. Gardner contends that the time and location at which the statement was made were in temporal and geographic proximity to the homicide. According to Gardner, a sufficient relationship between the statement at issue and the Flynn homicide existed so as to create an adequate foundation for the statement. Thus, Gardner asserts that the statement was improperly excluded on this lack of foundation ground.

Gardner claims that the improper exclusion of the statement was prejudicial to him. As Gardner points out, the statement supported his theory of the defense that someone else committed the crime. Further, Gardner contends that the fact the man who made the statement was black was especially important. This is because both Gardner and Vernon Flynn are white, but the hair found in Flynn's hand had racial inconsistencies with Flynn's known hair samples, indicating that Flynn may have struggled with and been killed by a non-white person. Thus, Gardner claims that the exclusion of the statement was not harmless error. Since the statement was not hearsay and was relevant to his defense, Gardner claims that the trial court's improper exclusion of the statement denied Gardner his Sixth Amendment right to present a complete defense.

The question of whether the trial court erred in excluding evidence is subject to an abuse of discretion standard of review. See *State v. Vaughn*, 254 Kan. at 204.

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. Judicial discretion must

thus be considered as exercisable only within the bounds of reason and justice in the broader sense and be considered abused only when it plainly overpasses those bounds." *State v. Stallings*, 262 Kan. 721, Syl. ¶ 6.

Della Zimmerman's statement about a man who said "repeat the killing" lacked an adequate foundation. The trial court did not abuse its discretion in so ruling. Zimmerman did not know who the man was; she did not say where he went after he made this comment and apparently stopped following her; she did not know on what date this conversation occurred; and she did not remember what he looked like and would not have been able to identify him. Since Zimmerman only heard part of what the man said, it is not even clear in what context he made this statement. Was the man talking about a movie he had just seen or the murder which occurred down the street? No one knows. Further, Gardner presented no witnesses who rode the bus with Zimmerman who might have seen her talking to this man and confirmed her testimony, at least in part. Zimmerman's testimony regarding the man's statement about "repeat the killing" was not supported by an adequate foundation. The trial court did not abuse its discretion by excluding Zimmerman's testimony regarding the statement at issue. This issue fails.

Affirmed.