No. 80,460

STATE OF KANSAS, *Appellee*, v. PATRICIA A. ALEXANDER, *Appellant*.

(1 P.3d 875)

Opinion filed March 10, 2000.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Patricia A. Alexander, from her conviction for the first-degree murder of Walter Young. Alexander raises six issues.

From the record it appears Alexander had a drug and alcohol problem, as did Young. Young was referred to as the "neighborhood drunk."

On May 3, 1997, Young went to the liquor store around 10:30 a.m. When he returned to his house, he had Alexander in the car with him. Alexander spent time at her niece's house, which was a short distance from Young's house.

It appears the police were called to the American Legion 4 days earlier because Alexander had struck Young regarding $15 Young

allegedly owed to Alexander. On the day of Young's death, officers had been called regarding the same argument. Young told the officers that Alexander had blackened his eye 2 weeks earlier.

At some point the argument resumed and Alexander started hitting Young with a plastic baseball bat. Young retreated to his house and returned with a knife. He was described as being very inebriated and somewhat incoherent. The knife was taken from him and returned to his house. Young returned to his house.

Alexander then went to Young's house. She banged on the front and back doors with a plastic bat. She eventually broke into the house through the back door. Spectators heard scuffling noises coming from the house.

Young appeared with Alexander in a headlock and holding a large knife to her throat. Numerous people encouraged him to not cut her and to give up the knife. A neighbor gained possession of the knife and put it back in Young's house. Alexander's niece attempted to get Alexander to leave Young's house, but she refused.

Next, Alexander and Young went into Young's house. Sometime later, Young appeared at Alexander's niece's house and told the niece to "come over and get your Auntie before I kill her." Young's shirt was bloody. Alexander was bleeding from her head and nose and suffered a broken nose and possibly a fractured eye socket.

Alexander later came out of Young's house with a knife. Young was already outside. The spectators began to yell for Young to run because Alexander had a knife. Young ran and Alexander pursued him about 80 yards and caught him. Young got Alexander in a headlock and she bit Young with her teeth on his chest. Alexander stabbed Young three times, at which time Alexander's niece gained possession of the knife.

Young was taken to the hospital where he died 2 weeks later. He was brain dead during that period due to loss of blood. Blood tests taken at the hospital showed a blood alcohol concentration of .225, and he tested positive for cocaine. Alexander was arrested and convicted of first-degree murder. This appeal followed.

## I. SELF-DEFENSE

Alexander first argues she was denied a fair trial because the trial

court gave the jury an instruction concerning Young's right to defend his dwelling. Alexander's basic argument is that the inclusion of the complained-of instruction muddled the self-defense issue to the point of depriving Alexander her right to a fair trial.

"When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous." *State v. Johnson*, 255 Kan. 252, Syl. ¶ 4, 874 P.2d 623 (1994).

The instruction complained of reads as follows:

"INSTRUCTION NO. 14

A person is justified in the use of force to the extent it appears to the person and the person reasonably believes that such conduct is necessary to prevent another from unlawfully remaining in or damaging that person's dwelling. Such justification requires both a belief on the part of a person and the existence of facts that would persuade a reasonable person to that belief."

The instruction was intended to allow the jury to consider whether Young was reasonable in his actions against Alexander when she broke into and entered his house earlier in the day. The judge explained his reasoning for giving Instruction No. 14:

"Next I have an instruction that advises the jury what the law is in regards to the defense of a dwelling. I found it necessary to include this instruction because there was evidence that the defendant invaded the dwelling place of the alleged victim. This instruction basically advises the jury of what, in fact, the alleged victim had the right to do once his dwelling place was being invaded."

Alexander takes a scattergun approach to this issue, arguing: (1) The instruction "eviscerated" her claim of self-defense; (2) it overemphasized her provocation of Young; (3) it minimized the legal significance of Young's attack on her earlier in the day; (4) it was misleading and confusing; (5) it shifted the burden of proof from the State to her; and (6) Instruction No. 14 was never meant to be used for anyone other than a defendant.

Because Young was not on trial, Instruction No. 14 should not have been given. This does not mean, however, that reversal is

required. The inclusion of Instruction No. 14 did not shift the burden of proof to Alexander. Instruction No. 15 (an instruction concerning Alexander's claim of self-defense and the burden of proof) clearly articulated that the burden of proof remains with the State. Instruction No. 14 in no way intimated that the burden should shift to Alexander.

The inclusion of Instruction No. 14 did not eliminate Alexander's claim of self-defense nor did the instruction confuse or muddle the issue of self-defense. Both Instruction Nos. 15 and 16 (instructing the jury on the justification of use of self-defense) clearly set forth the self-defense claim. A reasonable juror would not have reasoned that Young was justified in using force against Alexander out in the street later that day, as the two events were sufficiently disconnected from each other. A reasonable juror would not have confused the issue of Alexander's self-defense claims with Young's defense of his dwelling earlier in the day.

We hold that the jury could not have reasonably been misled by the self-defense instruction.

## II. USE OF FORCE

Alexander argues that the trial court should have included an instruction on "provocation of first force as excuse for retaliation" (PIK Crim. 3d 54.21) and "initial aggressor's use of force." PIK Crim. 3d 54.22. Alexander did not request such an instruction, and the failure to use the instruction was not clearly erroneous.

There is no evidence in the record before us from which a jury could conclude Alexander intentionally provoked Young to use such an attack as justification for the stabbing that occurred.

PIK Crim. 3d 54.22 would not have been applicable either, as both parts of the instruction would have required the jury to make a finding that Alexander either "used every reasonable means to escape" or had "in good faith withdrawn." The evidence at trial plainly showed that it was Alexander who chased Young down the street while threatening him with the knife. Alexander had to chase Young for 80 or more yards until she caught up with him. There was no testimony at trial which would have allowed any reasonable juror to conclude that Alexander had either "used every reasonable

means to escape" or had "in good faith withdrawn." Thus, it was not clearly erroneous to not give PIK Crim. 3d 54.21 and/or 54.22.

### III. HEAT OF PASSION

"Where a party fails to object to a jury instruction at the trial court level, an appellate court will reverse only if the instruction given was clearly erroneous. An instruction is clearly erroneous only if the appellate court reaches a firm conviction that if the trial error had not occurred, there is a real possibility the jury would have returned a different verdict." *State v. Carr*, 265 Kan. 608, Syl. ¶ 3, 963 P.2d 421 (1998).

See K.S.A. 22-3414(3).

Here, a typographical error occurred which escaped "spell checks," the trial judge, and counsel: The instruction given to the jury defined "heat of passion" as "any intense or vehement emotional excitement which was spontaneously *proved* from circumstances." (Emphasis added.) PIK Crim. 3d 56.04, however, defines "heat of passion" as "any intense or vehement emotional excitement which was spontaneously *provoked* from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection." (Emphasis added.) Thus, the trial judge used "proved" when he should have used "provoked."

The "heat of passion" definition was not objected to by either party. Alexander argues, however, that it was clear error to define "heat of passion" in such a way as to imply that Alexander had the burden of *proving* "excitement from the circumstances."

We hold that the jury would not have reached a different conclusion had the correct instruction been given. We have previously held that "heat of passion" is not a concept that is "so foreign to the vocabulary of the average juror as to require definition." *State v. Stafford*, 223 Kan. 62, 66, 573 P.2d 970 (1977). The instruction, as given, was essentially correct in that it conveyed the idea to the jury that "heat of passion" is "intense or vehement emotional excitement" and that it is "spontaneous." The fact that the word "provoked" was replaced by the word "proved" does not imply that the burden of proof shifted from the State to Alexander. The error

was minor and did not significantly affect the overall purpose of the instruction.

## IV. PHOTOGRAPHS

During its case in chief, the State introduced several interior photographs of Young's house into evidence. During her case in chief, Alexander attempted to introduce interior photographs of Young's house showing drug paraphernalia, rolling papers, seeds on a tin lid, empty beer cans, and a wadded up piece of foil on a shelf.

Although Alexander wishes to place this issue in a constitutional rights context by arguing that she was deprived of her constitutional right to present a defense when the photographs were excluded, the issue actually centers on a basic exclusion of evidence analysis.

The admission of evidence lies within the sound discretion of the trial court. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. Gardner*, 264 Kan. 95, 103-04, 955 P.2d 1199 (1998). The party asserting that the court has abused its discretion bears the burden of showing such abuse. *Lumley*, 266 Kan. at 950.

On appeal, Alexander argues that the photographs contained exculpatory evidence which should not have been excluded and which effectively denied her the right to present a defense. Although a defendant has a right to present a defense, this right is not without limits. The right does not give a defendant the right to introduce irrelevant and immaterial evidence under the guise of "presenting a defense." The right to present a defense is "subject to statutory rules and case law interpretation of rules of evidence and procedure." *State v. Thomas*, 252 Kan. 564, 573, 847 P.2d 1219 (1993).

A photographer testified to the contents of the photographs in front of the jury. An investigator also testified that he had collected a crack pipe and other drug paraphernalia from Young's residence. The jury was well aware that Young had been drinking since early

morning and had a blood alcohol level of .225 when he was taken to the hospital. The jury also heard testimony that the hospital detected cocaine in Young's blood. There is no error on this issue.

## V. PRIOR ALTERCATIONS

When determining whether evidence was properly admitted at the trial court level, the appellate courts utilize an abuse of discretion standard of review. *Lumley*, 266 Kan. at 950. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Gardner*, 264 Kan. at 103-04. Wide latitude is given to the district court in determining what evidence to admit. *State v. Sanders*, 258 Kan. 409, 423, 904 P.2d 951 (1995). The appellant has the burden of showing why admitted testimony should have been excluded. *State v. Spresser*, 257 Kan. 664, 668, 896 P.2d 1005 (1995).

Here, 4 days earlier, Alexander demanded that Young give her a ride to a nightclub after she had given him $15 to do so. When Young refused to drive Alexander to the nightclub, she beat him with her fist and some other object. Officers noted that Young had been drinking and that he smelled of alcohol at that time.

Prior to trial, Alexander filed a motion in limine seeking to exclude any evidence of the altercation between her and Young as being irrelevant and prejudicial.

Evidence of acts done or declarations made before, during, or after the happening of the principal occurrence may be admitted where those acts or declarations are so closely connected with the principal occurrence as to form in reality a part of the occurrence. *Sanders*, 258 Kan. at 423. Such evidence may show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *State v. Peterson*, 236 Kan. 821, 829, 696 P.2d 387 (1985).

Relationships are defined not only by emotions and feelings but also by events that take place between the parties as well as statements made by each of the parties. In this case, being able to determine the relationship between Alexander and Young aided

the jury in understanding why Alexander would chase Young down the street while wielding a knife. It would not be an accurate portrayal of the incident to the jury to show that Alexander chased Young down the street with a knife and then stabbed him without being able to describe their relationship as defined by the various altercations that had occurred prior to the stabbing. Such evidence is not merely a tool for prosecutors. It also aids a defendant who seeks to utilize self-defense as a defense in a homicide case. Without such evidence, a jury would not be able to discern the true nature and extent of the relationship of the parties. One cannot look at the final act of violence alone and make a determination whether the defendant was subjectively justified in using deadly force in defense of himself or herself.

Alexander argues that any statements Young made to police officers regarding the incident on April 29 should have been excluded as inadmissible hearsay. Not all hearsay is inadmissible. "To obtain admission of out-of-court statements, the State must either produce the witness or demonstrate that the witness is unavailable, and the court must find that the out-of-court statements bear sufficient indicia of reliability or show particularized guarantees of trustworthiness." *Sanders*, 258 Kan. at 418.

We have previously held that hearsay statements made by the deceased, prior to his or her death, concerning a discordant relationship, are admissible. See *State v. Clark*, 261 Kan. 460, 470-72, 931 P.2d 664 (1997) (allowing witnesses to testify that the defendant had threatened the decedent and that the decedent wanted the defendant to move out of her apartment); *State v. Young*, 253 Kan. 28, 37, 852 P.2d 510 (1993) (allowing witnesses to testify that the decedent had told them about the defendant's abusive behavior prior to her death); *State v. Mayberry*, 248 Kan. 369, 384-85, 807 P.2d 86 (1991) (allowing the decedent's friends to testify to several statements that the decedent had made prior to her death in which the decedent stated that she had been having problems with the defendant and that he had fought with and hit her); *State v. Taylor*, 234 Kan. 401, 407, 673 P.2d 1140 (1983) (allowing notes in as evidence that the deceased had written describing the abusive behavior of her defendant husband); and *State v. Fenton*, 228 Kan.

658, 667-68, 620 P.2d 813 (1980) (allowing the sheriff's wife to testify that the deceased told her that the defendant had threatened her).

Young's statements to officers concerning the April 29 incident were properly admitted to show Alexander and Young's discordant relationship and to provide motive and intent for Alexander's actions.

## VI. *BATSON* CHALLENGES

The State used four of its peremptory challenges to remove all of the African-American jurors from the jury pool, leaving only Caucasians on the jury.

Our standard of review is whether the trial court abused its discretion in determining the challenged strikes were constitutionally permissible. *State v. Vargas*, 260 Kan. 791, Syl. ¶ 1, 926 P.2d 223 (1996). Because the trial judge's findings in the context under consideration turn on evaluation of the credibility of the prosecutor, a reviewing court should give those findings great deference. *State v. Walston*, 256 Kan. 372, 378, 886 P.2d 349 (1994) (referring to *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 [1986]).

> " 'In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge . . . [the evaluation of which] lies "peculiarly within a trial judge's province." ' " *Walston*, 256 Kan. at 379 (quoting *Hernandez v. New York*, 500 U.S. 352, 364-65, 114 L. Ed. 2d 395, 111 S. Ct. 1859 [1991]).

Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. *Gardner*, 264 Kan. at 103-04.

The *Batson* analysis involves a three-step process. Once the opponent of a peremptory challenge has made out a prima facia case of racial discrimination, the burden shifts to the proponent of the strike to come forward with a race-neutral explanation. If a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful discrimination. *Vargas*, 260 Kan. 791, Syl. ¶ 2.

The second step of the *Batson* process does not demand an explanation by the prosecutor that is persuasive, or even plausible, but one that is merely facially valid. Further, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. The ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike. *Vargas*, 260 Kan. 791, Syl. ¶ 3.

In the case at bar, the State used four of its peremptory strikes to remove four African-Americans from the jury, which left none to try the case. Alexander is an African-American. Alexander argues that the use of the peremptory strikes was done for the purpose of removing African-Americans from the jury on the sole basis of their race.

The State first struck Mr. C, an African-American, from the jury. In stating reasons for Mr. C's removal, the State noted to the court that he was removed because he had indicated that a friend of his was recently killed. Mr. C had also indicated that he did not want to be on the jury and that he was unemployed and disabled. Mr. C notified the court that he did not know how he could be in court from day-to-day for the trial. The extent of Mr. C's disability cannot be ascertained from an examination of the record. Because the trial court was in the best position to assess Mr. C's disability and to determine whether he could carry out his duties as a juror, we hold that the trial court did not abuse its discretion in denying Alexander's *Batson* challenge to the removal of Mr. C.

The second removal challenged by Alexander was the removal of Mr. H, an African-American pastor. The State noted to the court that Mr. H was removed because it felt he could not render a fair verdict on the basis of his religious beliefs, despite the fact that Mr. H responded during voir dire that he would be able to serve, given his beliefs. Even though Mr. H told the court that he would be able to perform his duties as a juror, we have no way of knowing whether the State believed Mr. H or what his demeanor was when he answered the question. The State provided a racially neutral reason for the removal of Mr. H.

The trial court was in the best position to determine the demeanor of Mr. H and the credibility of the prosecutor's reasons

concerning this juror. The trial court did not abuse its discretion in denying Alexander's *Batson* challenge to the removal of Mr. H.

The third removal challenged by Alexander was the removal of Mrs. J. The State articulated its reason to the trial court by noting that Mrs. J was elderly and lived in the area where the crime occurred. The State also noted that it had removed two other non-African-American jurors for similar reasons.

Alexander argues that the State did not remove other jurors who were elderly and, therefore, the true reason that Mrs. J must have been removed was because of her race.

> " 'The fact that a prosecutor strikes an African-American juror, supposedly for Reason A, but does *not* strike a white juror, who exhibited the same Reason A, is certainly *circumstantial* evidence that the State is purposefully discriminating against African-Americans. This kind of circumstantial evidence may be sufficiently compelling in some cases to convince a trial court that the State is purposefully discriminating and that its race-neutral reasons are pretextual. However, comparison-based circumstantial evidence should not be considered conclusive in every case, as a matter of law.' " *State v. Lee*, 263 Kan. 97, 112, 948 P.2d 641 (1997) (quoting *Walston*, 256 Kan. at 381).

The State also noted to the court that it removed Mrs. J because she lived near the area where the crime occurred. Removal of a juror because he or she may have neighborhood ties with the defendant, the witnesses, or the victim, or may be subject to future harassment, is a valid nonracially motivated reason. See *Vargas*, 260 Kan. at 793-94, 796 (noting that the State had used race as a factor in removing jurors and that the State had noted that some of its reasons for removal were because the jurors lived in the area where the crime occurred). The trial court did not abuse its discretion in denying the *Batson* challenge to the removal of Mrs. J.

The last juror who Alexander alleges was removed for racial reasons was Mr. F. Upon being challenged, the State articulated that it had removed Mr. F because he may have known persons in the public defender's office (the same office defending Alexander) and may have known persons in the district attorney's office. Removal of a juror because he or she may be associated with investigators or attorneys working a case is not a racially based reason and has been upheld on appeal in *State v. Walker*, 252 Kan. 279, 299-300,

845 P.2d 1 (1993). Although it was not known at the time Mr. F was removed, it was later determined that, in fact, Mr. F was currently involved as a defendant in a pending criminal case and that he was being represented by the public defender's office. The trial court did not abuse its discretion in denying Alexander's *Batson* challenge to the removal of Mr. F.

Affirmed.

SIX, J., concurs in the result.