No. 83,165

STATE OF KANSAS, *Appellee*, v. VIRGIL S. BRADFORD, *Appellant*.

(34 P.3d 434)

Opinion filed November 16, 2001.

*Janine Cox*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Jared S. Maag*, assistant attorney general, argued the cause, and *John K. Bork* and *Kris Ailslieger*, assistant attorneys general, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Virgil Bradford appeals his conviction of capital murder, K.S.A. 21-3439(a)(6), for the intentional and premeditated killing of Kyle and Chrystine Moore as part of the same act or transaction, or in two or more acts or transactions connected together, or constituting parts of a common scheme or course of conduct; aggravated robbery, K.S.A. 21-3427, aggravated burglary, K.S.A. 21-3716; and two counts of theft, K.S.A. 21-3701. He was sentenced to life imprisonment with no chance of parole for 40 years (hard 40) on the capital murder conviction, 380 months on the aggravated robbery conviction, 68 months on the aggravated burglary conviction, 14 months on the first felony theft conviction, and 14 months on the second felony theft conviction, with each sentence to run consecutive to the other. Bradford appeals directly to our court pursuant to K.S.A. 22-3601(b)(1).

This is a companion case to *State v. Verge*, 272 Kan. 501, 34 P.3d 449 (2001).

Virgil Bradford and Robert Verge were charged with the crimes above-stated for which both were convicted. At Bradford's trial, he admitted to being present during the gruesome killing of both victims; however, he contended that Verge was the murderer. At Verge's separate trial, Verge offered a similar defense, claiming that Bradford was the murderer.

Kyle and Chrystine Moore were found dead in their residence on Solomon Road north of Solomon, Kansas, on the evening of February 17, 1997. Several officers investigated the crime scene. Blood stains were found in the living room, dining room, bathroom, and bedroom. The two victims were found dead in their bedroom. The bedroom was in a state of disarray, with blood stains on all the walls, the ceiling, and pieces of furniture. The victims' two vehicles were stolen.

The autopsy revealed that Kyle Moore died from blunt force injuries, sharp force injuries, and gunshot wounds; he was beaten,

stabbed, and shot, in that sequence. He had a total of 102 wounds on his body, some of which were defensive in nature. He was shot four to five times in the head at close range. The pattern of the shots indicated that he was not moving at the time he was shot, but he was still alive. There were a total of 10 gunshot wounds to his body.

Chrystine Moore died from multiple gunshot wounds in association with stab wounds. She was hit with a hard instrument in the head and stabbed in the chest. She was shot six or seven times. She was alive until the time she was shot in the head.

A knife wrapped in tissue paper, two empty handgun containers, an empty box of .22 caliber cartridges, several shell casings and slugs (none of which tested consistent with a .38 caliber revolver), and a pair of blood-stained sweat pants were found at the Moore residence. Bradford's blood was found on the sweat pants, the bathroom rug and mirror, the living room window, and a towel found under the window. Possible contributors of blood on a muddy sock located in one of the stolen vehicles were Bradford and the two victims.

Kyle Moore's State-issued vehicle was found in Kansas City, Missouri, parked outside of an apartment building. In the course of the investigation, the authorities became acquainted with one of the apartment residents, Charles Bostic.

Bostic testified for the State that one morning in February 1997, Bradford and Verge came to his apartment and made comments about killing police officers and showed him their guns when he did not take them seriously.

Testifying in his own defense, Bradford stated that he passed out in a car while Verge was driving, and the vehicle eventually ended up stuck in the mud in an unknown place. They walked to the Moore's home, and Verge was carrying a flashlight. Bradford stated that after unsuccessfully trying to get the attention of the occupants, he concluded that no one was home. He admitted noticing beforehand that two cars were parked outside and an outside light was on. Verge handed Bradford an empty .38 caliber revolver. Bradford then broke into the house with the intent to steal keys to one of the vehicles. He noticed a light was on after he broke in,

and he immediately headed toward the light. After entering the bedroom, he was attacked by Kyle Moore, and he hit Kyle several times on the head with the revolver. He claimed that while he was fighting with Kyle, Verge shot Chrystine. After she was shot, Kyle tried to protect her and was also shot by Verge. Bradford was unable to account for the several stabbing wounds present on both victims.

Bradford was convicted of capital murder for the intentional and premeditated murders of Kyle and Chrystine Moore, but the jury declined to assess the death penalty. He was also convicted of aggravated robbery, aggravated burglary, and two counts of theft. We consider the issues he raises on appeal.

*Sufficiency of evidence to support conviction of capital murder*

Bradford first contends there was insufficient evidence showing that he premeditated the murders. He argues (1) the actions preceding the murder do not show premeditation, (2) the fact two people were killed does not show premeditation, (3) the extent of the injuries does not show premeditation, (4) the use of multiple weapons does not show premeditation, and (5) there was no evidence that he aided and abetted the murders. Each subargument is made with the incorrect presumption that Bradford's own testimony is entirely truthful and binding upon this court.

When reviewing sufficiency of the evidence, we must review all the evidence, viewed in a light most favorable to the prosecution, and determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Rodriguez*, 269 Kan. 633, 634, 8 P.3d 712 (2000).

We have recently restated the standard of review for premeditation:

"Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 (1997). Premeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one. In such a case, the jury has the right to make the inference. *State v. Buie*, 223 Kan. 594, 597, 575 P.2d 555 (1978)." *State v. Alvidrez*, 271 Kan. 143, 148, 20 P.3d 1264 (2001).

This court has also set forth factors that may be considered in determining whether premeditation exists:

"We held in [*State v.*] *Moncla*[, 262 Kan. 58, 73, 936 P.2d 727 (1997)] that while the element of premeditation is not inferred from use of a deadly weapon alone, an inference of premeditation may be supported where additional circumstances are shown, including lack of provocation, conduct before and after the killing, or the striking of a lethal blow after the deceased was rendered helpless." *State v. Henry*, 263 Kan. 118, 130, 947 P.2d 1020 (1997).

In the present case, 25 wounds were inflicted on Chrystine Moore and 102 wounds on Kyle Moore. Competent testimony of the forensic pathologist tended to show that the victims were first beaten, then cut, and then finally shot several times each in the body and then several times in the head. The evidence also showed Kyle Moore was not moving when he was shot in the head, and that death did not occur until he was shot in the head. Chrystine Moore was also alive at the time she was shot in the head, and but for the gunshot wounds, she might have survived. The gun used to kill the Moores was their own, and an empty box of .22 caliber cartridges was found on the floor. This evidence viewed in the light most favorable to the prosecution was sufficient to support the jury's finding of premeditation to uphold the conviction of capital murder.

Furthermore, although Bradford claims that he severely beat Kyle Moore because Kyle first attacked him, the jury could have inferred from the evidence that Bradford and Verge broke into the house with full knowledge that it was occupied. According to Bradford's own testimony, two cars were behind the house, a light was on outside, and one was on inside. They entered the house with a .38 caliber revolver, although Bradford claims that he was told it was empty. The Moores were killed in the bedroom of their own home, and there were no wounds on their bodies that suggested that they made any aggressive acts. Hence, there was additional evidence to support a reasonable inference that the killings were done without provocation.

A total review of the facts reveals an abundance of evidence from which the jury could infer premeditation. Bradford's argument, which seems to presume that unless he directly admits to premeditating the killings he cannot be convicted thereof, is totally without merit.

*Sufficiency of aiding and abetting capital murder*

Bradford next challenges the evidence as insufficient to support a guilty conviction for capital murder under the theory of aiding and abetting.

In *State v. Wakefield*, 267 Kan. 116, 977 P.2d 941 (1999), we recited the following standard of review for sufficiency of the evidence in the context of aiding and abetting:

> "It is well established in Kansas law that the mere presence of an accused at the time and place of the crime alleged is not sufficient to make the accused guilty of the crime, but if from the facts and circumstances surrounding the defendant's presence at the time and from the defendant's conduct it appears that the defendant's presence did in fact encourage someone else to commit the criminal act, guilt may be inferred. *State v. Smolin*, 221 Kan. 149, 153, 557 P.2d 1241 (1976). In the absence of anything in a person's conduct showing a design to encourage, incite, aid, abet, or assist in the crime, the trier of the facts may consider failure of such person to oppose the commission of the crime in connection with other circumstances and conclude therefrom that the person assented to the commission of the crime, lent his or her countenance and approval thereto, and thereby aided and abetted the commission of the crime. 221 Kan. at 153." 267 Kan. at 121.

We noted in *Wakefield* that the defendant knew his accomplice was ascending the stairs of the home to kill the victims, and rather than attempting to stop him, the defendant continued taking items out of the victims' home. Such action was held sufficient. 267 Kan. at 123.

Bradford argues that because he testified that Verge was the trigger man and he did not help or participate with Verge in the murders, there was insufficient evidence for the jury to conclude he aided and abetted the premeditated murders. Bradford's testimony contained several inconsistencies, but issues of credibility are within the province of the jury and questions of credibility shall be resolved in favor of the State on appeal. *State v. McCray*, 267 Kan. 339, 343, 979 P.2d 134 (1999). A plethora of evidence existed from which a rational jury could have concluded that Bradford aided and abetted these murders.

*Batson challenge*

Bradford argues the State's peremptory challenge, and the court's refusal to find the challenge to be improper, was in violation

of *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), and *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

We recited our standard of review of *Batson* challenges in *State v. Pink*, 270 Kan. 728, 731-32, 20 P.3d 31 (2001):

"A three-step analysis applies to a *Batson* challenge. The defendant must first make a prima facie showing that the prosecution has used a peremptory challenge on the basis of race. Next, if a showing is made, the burden shifts to the prosecution to articulate a race-neutral reason for striking a juror, and, finally, the court then decides whether the defendant has carried the burden of establishing purposeful discrimination. See *State v. Edwards*, 264 Kan. 177, 192, 955 P.2d 1276 (1998).

"In *State v. Alexander*, 268 Kan. 610, 619, 1 P.3d 875 (2000), we stated: 'Because the trial judge's findings in the context under consideration turn on evaluation of the credibility of the prosecutor, a reviewing court should give those findings great deference. *State v. Walston*, 256 Kan. 372, 378, 886 P.2d 349 (1994) (referring to *Batson*).' In *Walston*, we further stated:

' "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge . . . [the evaluation of which] lies 'peculiarly within a trial judge's province.' [Citations omitted.]" ' 256 Kan. at 379.

"Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner. *State v. Gardner*, 264 Kan. 95, 103-04, 955 P.2d 1199 (1998)."

Venireperson T.B. was stricken by the State's peremptory challenge. T.B. is Hispanic and was the only minority individual remaining on the venirepanel at the time she was stricken.

When responding to Bradford's *Batson* challenge, the State argued: (1) that T.B. had answered on the jury questionnaire that she was neither in favor of nor opposed to the death penalty, although the State admitted that other potential jurors who had that quality may not have been stricken, (2) that T.B. appeared as though she did not want to be there, (3) that T.B. was a single parent and was concerned about being there, and (4) that the prosecutor had inadvertently insulted T.B. Bradford responded that the above listed reasons were insufficient to establish a race-neutral reason for striking T.B.

Bradford complains that the record does not support the prosecution's claim that T.B. was a mother and did not want to be at the proceedings. Bradford is mistaken. The prosecutor stated to the court that T.B. was a single parent and "it appeared that she did not want to be [there]." As we have noted, there will seldom be much evidence bearing on the issue of a *Batson* challenge, and the best evidence often will be the demeanor of the attorney who exercises the challenge, with the evaluation of that challenge peculiarly within a trial judge's province. See *Pink*, 270 Kan. at 731-32.

Finally, Bradford's contention that there is no support in the record for the State's argument that T.B. was inadvertently insulted by one of the prosecutor's questions is without merit. During voir dire, the prosecutor made the following statement during the questioning of one of the jurors:

"When a person has heard or read something about the case, and I think probably everybody has in this case, and I'm not sure we want jurors who knew nothing about the case, had never heard about the case, because that means they, perhaps, aren't very well informed, but . . . [we ask you] to disregard what you've heard."

A short time later, he questioned T.B. as to whether she had read about the case:

"PROSECUTOR: [T.B.], did you read or hear about the case?
"[T.B.]: No, I'm one of those not well informed people. I have—
"PROSECUTOR: Okay. This wasn't in this county, so there are certainly reasons why you may not have heard about it."

T.B. derogatorily characterized herself in rewording the prosecutor's earlier remarks, and it would not be unreasonable to conclude that her response was a reflection of her ill-feelings toward the prosecution. The record offers tangible support for counsel's assertions. Accordingly, we find the trial court did not abuse its discretion in upholding the State's peremptory challenge to *Batson* scrutiny.

### Admission of statements of a nontestifying codefendant

Bradford next argues that his constitutional right to confrontation was violated when Charles Bostic, one of the State's witnesses,

was permitted to recount statements of Robert Verge, the unavailable codefendant.

Prior to trial, Bradford filed a motion in limine to prevent Bostic from testifying to any statements made by Verge. In the motion, he denied being present at the time Verge made statements to Bostic. After hearing the motion, the court found that Bradford was present at the time the inculpatory statements were made, and by his silence and affirmative conduct the statements were adoptive admissions. The court denied the motion.

Bostic testified at trial. He stated that Bradford and Verge came to his apartment on February 17, 1997. They were both muddy and had specks of blood on them. He testified that Verge was talking about something but Bradford "hushed him up." On Verge's request, the three went to a different room and continued the conversation. Bostic then recounted the colloquy as it continued in the next room:

"Well, Robert had went on talking about they was supposed to kill some police, some police officers, and I was looking at him like, you know, whatever. So I'm looking at him, and he's like—he said—he told Virgil [Bradford] to show me, and Virgil lifted his shirt up and he had three guns going around his waist. So he pulled the guns out and laid them on the bed."

The record reflects, and neither side disputes on appeal, the defense lodged a timely objection to the above statement on hearsay grounds.

Bradford first points to decisions that the admission of confessions made by nontestifying codefendants which implicate the accused is a violation of the accused's Sixth Amendment right to confrontation. *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), and *State v. Butler*, 257 Kan. 1110, 1114, 916 P.2d 1 (1996). Bradford also contends that compliance with the hearsay exception of adoptive admissions under K.S.A. 2000 Supp. 60-460(h)(2) does not solve the Confrontation Clause problem. He cites *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), where the Supreme Court held the Confrontation Clause requires that a declarant be found constitutionally unavailable and the statements of such declarant bear sufficient indicia of reliability. Reliability can be inferred where the hearsay

falls into a firmly rooted exception, and in other cases there must be a showing of "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66.

Bradford argues on appeal that his act of "shushing" Verge in front of Bostic cannot be affirmatively interpreted as an adoption of Verge's statements about the killing. He is correct. However, he fails to make any argument that the action of lifting his shirt to show Bostic the guns may be subject to dual interpretation. When Bostic showed disbelief as to Verge's story about killing some police officers, Verge told Bradford to "show him." Bradford lifted his shirt, revealing three handguns, then laid the three guns on the bed. No credible argument could be made that Bradford's actions were not an adoptive admission to Verge's earlier admission of the killings.

Neither the State nor Bradford rely on *State v. Buckner*, 223 Kan. 138, 145, 574 P.2d 918 (1977), but a review of that holding shows it to be on point in the present case. In *Buckner*, we upheld the finding of an adoptive admission pursuant to 60-460(h)(2), where statements implicating a group of coconspirators, of whom defendant was one although he was not mentioned specifically by name, were made in defendant's presence to which the defendant responded only with silence. We found that the Confrontation Clause had not been violated because an adoptive admission is in essence the accused's own statement and does not depend on the credibility of a third party. 223 Kan. at 145 (citing *State v. Greer*, 202 Kan. 212, 214-15, 447 P.2d 837 [1968]).

This principle was again affirmed by this court in *State v. Sullivan & Sullivan*, 224 Kan. 110, 115-19, 578 P.2d 1108 (1978). In *Sullivan*, while dismissing the State's alternative effort to construe a statement as an adoptive admission, we expressed that adopted admissions do not fall within the purview of *Bruton* because adoption causes the statement to become that of the accused. 224 Kan. at 119.

As previously discussed, Bradford's actions evidencing his adoption far exceed mere silence. The trial court did not err in finding Bradford had adopted Verge's admission.

Assuming his argument against his actions being an adoptive admission fails, Bradford's fall-back position is that adoptive admissions must still meet the test of particularized guarantees of trustworthiness set forth in *Roberts* because K.S.A. 2000 Supp. 60-460(h) is not a firmly rooted hearsay exception. Essentially, he is contending that *Roberts* overrules, at least by implication, our progeny of case law, including *Buckner* and *Sullivan*, which place no such requirement on adopted admissions. This argument also fails.

When the Supreme Court decided *Roberts*, the Federal Rules of Evidence did not even classify an adopted admission as hearsay, but rather excluded it from the definition of hearsay. Fed. R. Evid. 801(d)(2)(b). Certainly, the Court did not intend to impose more stringent restrictions on evidence in state courts than in federal courts. Several federal circuit courts agree that adoptive admissions are not required to meet the additional requirements of trustworthiness set forth in *Roberts* because they are either a firmly rooted exception or not included in the definition of hearsay. See *Berrisford v. Wood*, 826 F.2d 747, 751 (8th Cir. 1987), *cert. denied* 484 U.S. 1016 (1988); *United States v. Monks*, 774 F.2d 945, 951-52 (9th Cir. 1985); *U.S. v. Beckham*, 968 F.2d 47, 51 (D.C. Cir. 1992); see also *Nueman v. Rivers*, 125 F.3d 315, 320 (6th Cir. 1997) (citing the advisory notes to Fed. R. Evid. 801[d][2], which state no guarantee of trustworthiness is required because admissions are not hearsay).

We have recently discussed this exact question in *State v. Betts*, 272 Kan. 369, 33 P.3d 575 (2001), where we specifically concluded that "[t]he hearsay exception under K.S.A. 2000 Supp. 60-460(h)(2) for adoptive admissions, including admissions by silence, is a firmly hearsay exception." Syl. ¶ 9. The testimony was properly admitted under K.S.A. 2000 Supp. 60-460(h)(2).

*Admission of multiple photographs of crime scene and autopsies*

Bradford asserts that the trial court abused its discretion and committed reversible error by admitting an excessive number of gruesome photographs which merely inflamed the jury and lacked evidentiary value. This court reviews the admission of evidence

under an abuse of discretion standard. *State v. Bornholdt*, 261 Kan. 644, 667, 932 P.2d 964 (1997).

In support of his argument, Bradford directs us to four of our prior decisions: *State v. Harris*, 259 Kan. 689, 915 P.2d 758 (1996); *State v. Walker*, 252 Kan. 279, 845 P.2d 1 (1993); *State v. Prouse*, 244 Kan. 292, 767 P.2d 1308 (1989); and *State v. Boyd*, 216 Kan. 373, 532 P.2d 1064 (1975).

The facts presented to us are not similar to those in *Boyd*, where an unnecessary photograph of the victim during a highly invasive autopsy procedure was introduced. The remaining cases cited by Bradford all upheld the admission of the challenged photographs. Most instructive is *Walker*.

In *Walker*, the defendant challenged the introduction of 18 photographs and transparencies depicting the victim's body, including 1 of the hyoid bone removed and 1 photograph of the victim in life. The hyoid bone was the only picture showing invasive autopsy. All the photos and transparencies, with the exception of the photo of the victim in life, depicted the victim's various wounds received during the attack upon her. We first opined: "Demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue," and then held that each picture was relative to proving an element of the crime. 252 Kan. at 287. As per defendant's argument that the transparencies were improperly introduced because they made the victim appear "larger than life," we noted that the transparencies were used to enable all the jury to see simultaneously and follow the pathologist's testimony. No abuse of discretion was found. 252 Kan. at 287.

Bradford appeals the introduction of 37 photographs of various parts of the bodies of Kyle and Chrystine Moore; each photograph was 13 by 21 inches and mounted on foam board backing. Each picture relates to a portion of the State pathologist's testimony and displays particular wounds, blood stain patterns, the original condition of the bodies prior to autopsy, or a combination of these. None of the pictures are excessively gruesome, nor do they depict any unnecessarily intrusive autopsy procedures. The enlarged pho-

tographs allowed the State's expert to explain them to the entire jury panel simultaneously.

As discussed earlier, premeditation was a contested issue in Bradford's case. The number and manner of wounds, as well as the various weaponry used to inflict them, was relevant circumstantial evidence on the issue of premeditation. Therefore, the exhibits did not lack evidentiary value. Furthermore, the gruesome nature of the photographs was merely a reflection of the gruesome nature of the murders, and not a result of the autopsy procedures. In addition, the size of the pictures does not raise an issue, as we have previously upheld the use of an overhead projector to display exhibits when used for the purpose of aiding the expert's testimony. *Walker*, 252 Kan. at 287. The trial court did not abuse its discretion in admitting the exhibits.

*PIK instruction on voluntary intoxication*

Bradford contends the trial court erred in giving PIK Crim. 3d 54.12-A-1 relating to voluntary intoxication, rather than instructing according to the statute, K.S.A. 21-3208. He did not object to this instruction below but contends the instruction as given was clearly erroneous. We review such a contention as follows: " 'An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there is a real possibility the jury would have returned a different verdict.' [Citation omitted.]" *State v. Kelly*, 262 Kan. 755, 764, 942 P.2d 579 (1997).

Bradford was given a voluntary intoxication instruction for his specific intent crimes of capital murder, lesser included offenses of first-degree murder or felony murder, and aggravated burglary. The principal language to which he now claims as error on appeal is as follows: "Voluntary intoxication may be a defense to the charge of [specific intent crimes], where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the necessary [premeditation or intent to kill . . . (or) intent to commit the underlying felonies]." As previously stated, this follows the PIK wording and, absent facts

warranting modification, should be followed. See *State v. Diaz*, 263 Kan. 331, 335, 949 P.2d 1093 (1997).

Bradford has failed to demonstrate any need to modify the PIK instruction. He claims in his brief that the instruction should have been formulated in a manner that made intoxication one factor out of several for the jury to consider when determining if he was capable of the requisite intent. Other factors he asserts should have been included are "his low intelligence and other aspects of his character and background." Bradford fails to make any designation in the record to support the existence of these additional factors. "The defendant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, an appellate court presumes that the action of the trial court was proper. [Citation omitted.]" *State v. Moncla*, 262 Kan. 58, 68, 936 P.2d 727 (1997).

Bradford also argues that the PIK instruction does not accurately reflect the statute and that the PIK instruction and current status of Kansas case law violate due process by depriving him and other defendants of their full statutory rights. K.S.A. 21-3208 reads:

"(1) The fact that a person charged with a crime was in an intoxicated condition at the time the alleged crime was committed is a defense only if such condition was involuntarily produced and rendered such person substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct to the requirements of law.

"(2) An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

Bradford contends that under this statute, voluntary intoxication for specific intent crimes should not be an "all or nothing" defense; rather, it should be a factor taken into consideration when determining intent regardless of whether the intoxication alone prevented the individual from forming the requisite intent.

Bradford acknowledges that this argument runs contrary to present case law, but he complains that under *Ross v. Oklahoma*, 487 U.S. 81, 101 L. Ed. 2d 80, 108 S. Ct. 2273 (1988), this court cannot interpret a statute to impair a right created by the legislature. Con-

trary to Bradford's contention, our interpretation of K.S.A. 21-3208 is not an act of judicial legislation.

At issue in this case is the phrase "the fact of intoxication may be taken into consideration in determining such intent or state of mind." K.S.A. 21-3208(2). The legislature did not expressly specify how voluntary intoxication was to be taken into consideration, nor did it mandate consideration.

Construing the statute as a whole, *in pari materia*, a review of K.S.A. 21-3208(1) is enlightening. There, the legislature required that two conditions be met prior to involuntary intoxication acting as a defense to a crime. The intoxication (1) must be involuntary and (2) it must render the individual "substantially incapable of [a] knowing or understanding the wrongfulness of his conduct and [b] of conforming his conduct to the requirements of law." K.S.A. 21-3208(1).

Reading the statute as a whole, the voluntary intoxication defense clearly does not require the intoxication to be involuntary, but the clearest test to determine when the fact of voluntary intoxication *may* be taken into consideration is drawn from the second requirement enumerated in the involuntary intoxication defense. If the voluntary intoxication renders an individual "substantially incapable" of forming the requisite specific intent or state of mind for the crime in question, then it shall be submitted as a defense instruction to the finder of fact. This is the test now embodied in PIK Crim. 3d 54.12-A-1, as well as our relevant case law.

For almost 2 decades, since the first reported decision on K.S.A. 21-3208, we have interpreted the voluntary intoxication defense as requiring the defendant to show he or she was unable to form the requisite intent due to the intoxication. See *State v. Seely*, 212 Kan. 195, 203, 510 P.2d 115 (1973)(this court approved the PIK instruction and stated: "Thus, voluntary intoxication such as afflicted appellant would be a defense if it rendered him incapable of forming a 'particular intent' which formed a necessary element of the crime charged."). No decision has required or permitted a voluntary intoxication defense instruction when a defendant flippantly claimed to be affected by a small level of intoxicating substance. In fact, in

the more recent case of *State v. Gonzalez,* 253 Kan. 22, 25, 853 P.2d 644 (1993), evidence that the defendant consumed "most of two 12-packs of beer" in a 4-hour period was insufficient, in light of other facts showing that the defendant did in fact form an intent, for this court to conclude that the lack of a voluntary intoxication instruction was clearly erroneous. See *State v. Hayes,* 270 Kan. 535, 542-43, 17 P.3d 317 (2001) (defendant consumed beer and whiskey but no evidence that consumption impaired his mental facilities so as to render him unable to form the requisite intent).

The legislature has not chosen to modify this court's interpretation of K.S.A. 21-3208 in the past 28 years since our decision in *Seely.* We cannot now presume that our inveterate reading of the statute has impaired any rights created by the legislature. Bradford's arguments do not show the jury was erroneously instructed.

*Instruction pertaining to aiding and abetting*

Bradford next contends that the jury instruction given on aiding and abetting improperly stated the law and allowed the jury to convict him of capital murder even if it only found that he aided and abetted the aggravated burglary. Neither contention has merit.

The jury instruction given stated:

"A person who, either before or during its commission, intentionally and substantially aids or abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed.

"Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor.

"To be guilty of aiding and abetting in the commission of a crime the Defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed."

In *State v. Jackson,* 270 Kan. 755, 760-61, 19 P.3d 121 (2001), we stated:

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case and a jury could not reasonably have been misled by them, the instructions

do not constitute reversible error even if they are in some way erroneous. *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337 (1998).

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of a trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. *State v. Sims*, 265 Kan. 166, 168, 960 P.2d 1271 (1998)."

The first paragraph of the instruction given follows PIK Crim. 3d 54.05, with minor changes that help only to increase the standard for aiding and abetting. Neither party alleges error with this portion of the instruction.

The second paragraph of the instruction is taken from the notes of the PIK instruction, as well as the decision of *State v. Green*, 237 Kan. 146, 697 P.2d 1305 (1985). As stated by the notes of the instruction, and by our court, the "mere association" language is not required when giving the aiding and abetting instruction. See *Jackson*, 270 Kan. at 761. Again, neither party claims this portion was error.

The third paragraph of the instruction is also taken from the notes of the PIK instruction and our holding in *State v. Schriner*, 215 Kan. 86, 523 P.2d 703 (1974). It represents an accurate statement of Kansas law. It serves only to expand upon the definition of aiding and abetting as used in the first paragraph, thereby raising, not lowering, the evidentiary standard for a finding of guilt by aiding and abetting.

Bradford's argument that this instruction would allow him to be found guilty of capital murder even if the jury only found that he aided and abetted the aggravated burglary is misguided. The third paragraph of the instruction began with the phrase "To be guilty of aiding and abetting." Bradford was not charged with aiding and abetting, nor is that in itself a crime. Hence, a conclusion that the third paragraph was satisfied would not allow the jury to find the defendant guilty of all other crimes. Rather, the only potential for a finding that Bradford might have been guilty of a crime by aiding and abetting was presented in the first paragraph: "A person who . . . intentionally and substantially aids or abets another to commit a crime . . . is criminally responsible for the crime com-

mitted." This portion also clearly limits guilt by aiding and abetting to the specific crime which was aided or abetted. Bradford's contention that he could have been found guilty of several crimes by aiding or abetting in the commission of only one fails. The trial court did not err in the instruction given.

*Trial court's correction of defense counsel on the burden of proof*

During voir dire, Bradford's counsel asserted that the burden of proof for the State was to prove its claims "beyond a reasonable doubt." The court, in front of the seven members of the venire being interviewed at that time, chastised the defense counsel for misstating the burden of proof, specifically stating that the standard was "no reasonable doubt" rather than "beyond a reasonable doubt." While we express doubt in Bradford's allegations of judicial impropriety, the point is moot. The record reflects that all of those jurors were excused on the court's own motion for fear that the court's comments might have prejudiced them. There is no way this comment could have resulted in reversible error.

*Prosecutorial misconduct during closing argument*

Bradford points to the following statement of the prosecutor during closing as reversible prosecutorial misconduct because it impermissibly shifted the burden of proof:

> "The defendant makes a feeble claim that because he used drugs and alcohol he could, therefore, not form the intent to premeditate the killing of Kyle and Chrystine, but, again, look at his actions. He tells us that he smoked wet in Kansas City, that he was stuck, that he felt he couldn't move. There were other people at this party. He has a doctor he says who prescribed pain medication that he doubled up on. He could have got those other people here to testify and he didn't. . . .
>
> . . . .
>
> "There's nobody that admits to that evidence other than the defendant."

The defense counsel interposed a timely objection.

During Bradford's opening statement, his counsel admitted he was involved in the killings, but denied the killings were premeditated. Bradford testified he had been at a party the evening of the killings; he was extremely high on PCP, marijuana, and alcohol; he was walking unevenly; and people were making fun of him. He also claimed that his doctor had prescribed muscle relaxants and pain

pills for a pinched nerve and that he had taken twice the recommended dosage that day. He testified he was still under the influence of the illegal drugs and alcohol after he left the Moore's residence. He also testified that immediately after the murders occurred, he wondered if the murders were nothing more than a hallucination caused by the PCP. Again in his closing statement, Bradford's counsel admitted to Bradford's participation in the murders, but denied intent and premeditation. Defense counsel reminded the jury that Bradford was on PCP at the time when the prosecution alleged that Bradford had formed his premeditation, and he stated that Bradford and Verge were "intoxicated" when they "wander[ed] to the nearest house."

We recently analyzed this issue in *State v. Deiterman*, 271 Kan. 986, 29 P.3d 411 (2001). In *Deiterman*, the prosecution commented on the defendant's failure to produce witnesses to support his alibi and a receipt of car parts allegedly purchased close to the time of the murder. The defendant complained that the comments impermissibly shifted the burden of proof. We noted that it was the defendant who proffered the theory about purchasing the car parts and who claimed to have been seen by several individuals close to and during the time of the murder. In upholding the propriety of the comments, we stated:

"When the theory of the defense is based upon facts within the personal knowledge of a particular person or persons available as witnesses and no attempt to secure their testimony is made the failure to produce available evidence may give rise to an inference that it would be adverse to the party who could have produced it." 271 Kan. at 986.

In the present case, Bradford's theory of defense to the capital murder charge was that he neither intentionally nor with premeditation killed the victims. Individuals who could have bolstered his defense were certainly within Bradford's personal knowledge and available to him, including his doctor and individuals present at the party who mocked his uneven gait, yet he made no attempt to secure their presence or testimony. With premeditation and intent being in question, the State did not improperly test the theory of the defense by pointing out that Bradford failed to produce any witnesses in support thereof.

## Upward departure

Bradford next contends that the upward durational departures on his aggravated robbery, aggravated burglary, and theft convictions were unsupported by substantial and compelling circumstances. Bradford's maximum applicable sentences were doubled pursuant to the State's motion for upward departure, and the sentences were ordered to be run consecutively after he completed his life sentence.

We need not discuss Bradford's contention because subsequent to the filing of his brief herein, the Kansas upward durational departure scheme was held to be unconstitutional in *State v. Gould*, 271 Kan. 395, 23 P.3d 801 (2001). We looked to and followed the United States Supreme Court decision of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. (2000), and held: "*Apprendi* dictates our conclusion that Kansas' scheme for imposing upward departure sentences, embodied in K.S.A. 2000 Supp. 21-4716, violates the due process and jury trial rights contained in the Sixth and Fourteenth Amendments to the United States Constitution. Gould's sentence must be vacated and remanded for resentencing." *Gould*, 271 Kan. at 414. Likewise, Bradford's upward durational departure sentence for the aggravated robbery, aggravated burglary, and the theft convictions must be vacated and this matter must be remanded for resentencing.

## Is the Kansas hard 40 sentencing scheme unconstitutional?

Bradford argues that the Kansas hard 40 sentencing scheme violates the guarantees of the Sixth and Fourteenth Amendments to the United States Constitution, as well as § 5 of the Kansas Constitution Bill of Rights. Since the filing of his brief, the constitutionality of the hard 40 sentencing scheme has been considered and upheld. See *State v. Conley*, 270 Kan. 18, Syl. ¶ 3, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). Our decision has been subsequently affirmed by *State v. Lopez*, 271 Kan. 119, 142, 22 P.3d 1040 (2001). The arguments raised by Bradford have been fully considered and answered in the above-stated opinions, and we will not repeat those discussions here.

*Trial court's imposition of the hard 40 sentence after the jury re-fused to impose the death penalty*

Bradford next contends that K.S.A. 21-4635 violated his due process rights and, therefore, is unconstitutional because the trial court was permitted to set aside the jury's determination that the mitigating circumstances did not outweigh the aggravating circumstances. This contention is not tenable.

A brief review of the capital murder law and hard 40 sentencing scheme is helpful in understanding this creative argument. Prior to 1994, K.S.A. 21-4624 established the procedure for determining whether an individual would receive a hard 40 sentence when convicted of first-degree murder. See L. 1990, ch. 99, § 4. The statute required that in order for a jury to impose a hard 40 sentence, it had to unanimously agree that a statutory aggravating circumstance or circumstances existed, and that those circumstances were not outweighed by the mitigating circumstances. In 1994, the legislature amended the statute to apply to the administration of the death penalty rather than the hard 40 sentence; however, the balancing test of aggravating and mitigating circumstances was not changed. L. 1994, ch. 252, § 4.

In the same year, K.S.A. 21-4635 was passed. See L. 1994, ch. 341, § 6. That statute required the trial court to determine whether a defendant convicted of capital murder when the jury did not impose the death penalty should be required to serve 40 years of mandatory imprisonment. The balancing test for the death penalty was incorporated, except that the court did not need to find the existence of aggravating circumstances beyond a reasonable doubt. Just as the jury was required to determine whether the aggravating circumstances were outweighed by the mitigating circumstances, so was the court. However, K.S.A. 21-4635(c) expressly permitted the court to make findings concerning the aggravating circumstances, and the ultimate balancing of the aggravating and mitigating circumstances that might be contrary to those made by the jury during the death penalty sentencing phase.

Bradford was convicted of capital murder, but the jury could not unanimously agree on imposing the death penalty; therefore, he

fell within the language of K.S.A. 21-4635(a), which stated: "[T]he trial court shall determine whether the defendant shall be required to serve a mandatory term of imprisonment of 40 years or sentenced as otherwise provided by law."

The trial court made the determination that the statutory aggravating circumstances existed and those circumstances were not outweighed by the mitigating circumstances. The court then imposed the hard 40 sentence pursuant to K.S.A. 21-4638.

Bradford claims that the trial court, by balancing the circumstances presented to the jury yet coming to a different result, had usurped the role of the jury in violation of his due process rights. He cites no compelling authority, but does analogize the court's action to the improper removal of a juror as discussed in *State v. Stafford*, 255 Kan. 807, 823-25, 878 P.2d 820 (1994). *Stafford* was decided under the previous statutory scheme which required a hard 40 sentence to be determined by a unanimous jury and is in no way applicable to our facts.

There are a myriad of differences between a jury's determination and that of a court. The jury had to find beyond a reasonable doubt that there were one or more aggravating circumstances. However, to impose the hard 40 sentence, the judge had to find proof of one of the aggravating circumstances only by a preponderance of the evidence. We need not repeat our analysis made in either *State v. Spain* (*Spain I*), 263 Kan. 708, 714, 953 P.2d 1004 (1998), or *State v. Spain* (*Spain II*), 269 Kan. 54, 4 P.2d 621 (2000), which is applicable here as it relates to the imposition of the hard 40 sentence. We specifically stated in *Spain I* that the rules and circumstances are different when the death penalty is not implicated. 263 Kan. at 709-10. Once the death penalty was not an issue, the trial judge's obligations were clearly and properly set forth and were lawfully exercised in this situation. The arguments of Bradford fail. The hard 40 sentence was properly entered.

*Does double jeopardy prevent imposition of the death penalty if Bradford is granted a new trial?*

Bradford finally argues that if he is granted a new trial, the death penalty should not be an option. In that we find no reversible error, this issue is moot.

Convictions affirmed, sentences vacated in part, and case remanded for resentencing in accordance with this opinion.